**The STATE of Ohio, Appellee,**

v.

**KINLEY, Appellant.**

[Cite as *State v. Kinley* (1999), 136 Ohio App.3d 1.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 99CA20.

Decided Nov. 12, 1999.

2

4

*Stephen A. Schumaker,* Clark County Prosecuting Attorney, and *David E. Smith,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* State Public Defender, and *Susan M. Roche,* Assistant State Public Defender, for appellant.

WOLFF, Judge.

Juan Antonio Lamar Kinley appeals from a judgment of the Clark County Court of Common Pleas, which dismissed his petition for postconviction relief without a hearing.

In 1989, Kinley was accused of the murders of his girlfriend, Thelma Miller, and her twelve year old son, David. The Millers were hacked to death with a machete on January 10, 1989, in the garage of Richard and Elaine Szulewski, for whom Thelma had worked as a housekeeper. In 1991, Kinley was convicted by a three-judge panel of the Millers' aggravated murders and was sentenced to death. We affirmed his conviction in *State v. Kinley* (June 24, 1993), Clark App. No. 2826, unreported, 1993 WL 224496. The Supreme Court of Ohio also affirmed. *State v. Kinley* (1995), 72 Ohio St.3d 491, 651 N.E.2d 419.

Kinley filed a petition for postconviction relief pursuant to R.C. 2953.21 on September 20, 1996. In his petition, Kinley asserted eighteen claims for relief,

requested a hearing on these claims, and asked the trial court either to grant him a new trial or to declare the death sentence void and impose a life sentence. When he filed the petition, Kinley also filed a motion requesting that Judge Gerald F. Lorig recuse himself from presiding over the postconviction proceedings on the basis that he would be called as a witness. Judge Lorig had been the presiding member of the three-judge panel that convicted Kinley. Judge Lorig voluntarily recused himself on October 21, 1996. Kinley's case was transferred to Judge Richard J. O'Neill. On November 25, 1996, the state filed a motion for dismissal of Kinley's petition and for summary judgment. Kinley responded to the state's motion on December 20, 1996.

In September 1998, Kinley filed a motion to recuse Judge O'Neill in order to avoid the appearance of impropriety of Judge O'Neill assessing the credibility of Judge Lorig, who was a member of the same bench. Kinley's motion to recuse Judge O'Neill was granted on October 8, 1998, and Judge Thomas W. Mitchell, a retired judge from the Jackson County Court of Common Pleas, was assigned to the case. Judge Mitchell granted the state's motion to dismiss Kinley's petition on February 10, 1999 without a hearing.

Kinley raises three assignments of error on appeal.

VI. "The trial court erred in granting summary judgment against appellant Kinley and dismissing his post–conviction action in violation of appellant's rights under Fifth, Sixth, Eight[h], and Fourteenth Amendments to the United States Constitution."

Kinley raises numerous arguments under this assignment of error. First, he claims that his waiver of a jury trial was not knowing, intelligent, and voluntary because he was coerced into trading his right to a jury for funding of a mental health expert for the mitigation phase of the trial. He also claims, more generally, that his waiver was not knowingly made and that his attorneys were ineffective because his attorneys did not apprise him of all of the risks of waiving a jury, including the increased risk of being sentenced to death and the "diminished * * * opportunity of reversal on appeal" if tried by a three-judge panel. Second, Kinley claims that the state knowingly offered false testimony at trial from Donald Merriman and Victor Bishop, both of whom now admit that their testimony was false. Third, Kinley asserts that his attorneys were ineffective in that they did not request funds for a blood splatter expert or a metallurgist to testify on his behalf at trial. Fourth, Kinley claims that his trial counsel were ineffective in failing to call Dawn Mitchell and Richard Howard on behalf of the defense, both of whom could have testified that they had seen Thelma Miller with another man the day of her murder. Kinley also claims that his attorneys were ineffective because they "failed to adequately discover, develop, and present mitigating information" at the mitigation phase of his trial.

Fifth, Kinley claims that his due process rights have been violated by the state's failure to preserve potentially exculpatory evidence. This claim relates to the machete that was introduced at trial but was subsequently lost, thereby depriving Kinley of an opportunity to test the alleged murder weapon in these postconviction proceedings. Sixth, Kinley contends that he did not knowingly, voluntarily, and intelligently waive the conflict of interest that was created by the Clark County Public Defender's representation of him and of Merriman, who allegedly received a plea bargain in exchange for his testimony against Kinley. Lastly, Kinley argues that his constitutional rights were violated because the Clark County prosecutor intentionally applied the death penalty in a racially discriminatory manner. We will address these claims in an order that facilitates our discussion.

A postconviction proceeding is not an appeal of a criminal conviction, but a collateral civil attack on a criminal judgment. *State v. Steffen* (1994), 70 Ohio St.3d 399, 410, 639 N.E.2d 67, 75–76. State postconviction review is not a constitutional right. *Id.,* citing *Murray v. Giarratano* (1989), 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1. Therefore, the petitioner receives no more rights than those granted by statute. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 281, 714 N.E.2d 905, 909.

R.C. 2953.21 provides that a person convicted of a crime may petition the court to set aside that conviction on the grounds that the defendant's constitutional rights were violated, thereby rendering that conviction void or voidable. A criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing. *State v. Cole* (1982), 2 Ohio St.3d 112, 113, 2 OBR 661, 662–663, 443 N.E.2d 169, 170; R.C. 2953.21(C) and (E). Before granting a hearing, the court shall determine whether there are substantive grounds for relief based on the petition, the supporting affidavits, and the files and records of the case. R.C. 2953.21(C).

If an alleged constitutional error could have been raised and fully litigated on direct appeal, the issue is *res judicata* and may not be litigated in a postconviction proceeding. *State v. Perry* (1967), 10 Ohio St.2d 175, 179, 39 O.O.2d 189, 191–192, 226 N.E.2d 104, 107–108. If, however, the alleged constitutional error is supported by evidence outside the record as well as evidence appearing in the record, and thus could not have been fully litigated on direct appeal, the issue is not subject to the doctrine of *res judicata.* *State v. Smith* (1997), 125 Ohio App.3d 342, 348, 708 N.E.2d 739, 742–743.

The trial court's entry dismissing Kinley's petition found that Kinley had "had the opportunity to present [at trial and on appeal] all of the matters he now complains of that kept him from getting a fair trial." Thus, the trial court

8

apparently concluded that all of Kinley's claims were barred by *res judicata.* Because many of the claims in Kinley's petition were supported by evidence outside the record of the case, the trial court erred in concluding that all of Kinley's claims were barred by *res judicata.* The trial court's findings of fact and conclusions of law stated some other bases for dismissing Kinley's various claims. Accordingly, we will consider whether the trial court properly dismissed Kinley's claims on other grounds.

■ Kinley claims that he was denied the effective assistance of counsel in various ways. Kinley was entitled to a hearing on these claims if his petition demonstrated that there were substantive grounds to conclude that counsels' performance fell below an objective standard of reasonableness and that there was a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674, 695, 697–698; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

■ Kinley claimed that his attorneys were ineffective in not requesting funds for a blood splatter expert or a metallurgist. In the postconviction proceedings, Kinley hired a blood splatter expert who opined, with virtual certainty, that the killer of Thelma and David Miller "would have had substantial blood splatter deposited on his clothing." The expert based this conclusion upon his examination of the trial record and upon "experimental tests" purportedly simulating the machete attack on the Millers with a blood-soaked mannequin. Pictures from the experimental tests that were attached to the expert's affidavit showed the mock-attacker speckled with, but not drenched in, blood. Presumably, expert testimony of this nature would have helped to establish reasonable doubt when considered along with Victor Bishop's claim at trial that he had seen Kinley twice on the day of the murder (likely before and after the time of the murders), that Kinley had seemed to be wearing the same clothing on both occasions, and that Bishop had not seen any blood on Kinley.

In our judgment, when viewed in light of the other evidence offered in Kinley's case, expert testimony on blood splatter would have been marginally helpful at best. Overwhelming evidence of the gruesome nature of the crime was presented at trial. This evidence included pictures and descriptions of the victims' wounds and the condition of the garage in which they were killed. The trial court could have had little doubt that the murderer was bloodied by the attack. Thus, counsels' performance did not fall below an objective standard of reasonableness for failing to seek funding for a blood splatter expert. Moreover, notwithstanding Bishop's testimony, there was strong physical evidence that Kinley had been at the scene of the crime. The police found blood stains on the steering wheel,

brake handle, and driver's arm rest of the car that Kinley had been driving the day of the murders, and the driver's floor mat of the car was missing. Although the quantity of blood in the car was insufficient for blood typing, the blood on the steering wheel was determined to be human blood. Blood found on a jacket Kinley was wearing a few days after the murders matched the blood of David Miller in DNA testing. In light of this evidence, it is highly unlikely that an expert's assertion that the murderer would have been covered in blood would have helped Kinley's case. Because Kinley did not present substantive evidence that his attorneys had been ineffective in failing to request funding for a blood splatter expert, the trial court did not err in dismissing this claim without a hearing.

Kinley also claimed that his attorneys should have hired a metallurgist to conduct tests upon the machete that was introduced at trial. Kinley was unable to have the machete tested in the postconviction proceedings because it had been misplaced subsequent to trial. His argument is based on speculation that, if the weapon had been tested by a metallurgist, the tests would have helped in his defense.

In support of his claim, Kinley presented the affidavit of an expert in materials science and engineering stating that he had been asked to conduct tests on and provide an opinion about the machete introduced at Kinley's trial, but that he had been unable to do so without access to the weapon itself. The affidavit did not discuss what kind of tests the expert would have conducted or for what purpose. Furthermore, the affidavit did not discuss the likelihood that the expert could have determined anything about the weapon that would have been pertinent to the crime. Without some indication of the likelihood that the proposed tests would have provided evidence bearing on Kinley's guilt or innocence, we cannot conclude that trial counsel acted ineffectively in failing to obtain these tests.

It is unfortunate that the alleged murder weapon has been misplaced and was unavailable for testing during these postconviction proceedings. Nonetheless, we recognize that Kinley's claims that tests might have proven that the machete was not the weapon used in the crime are highly speculative. Even if Kinley had found an expert to testify that the machete found near Kinley's home was not the murder weapon, the trial court would have been entitled to weigh the credibility of this testimony against the circumstantial evidence connecting the weapon with Kinley and the other evidence of his guilt, which was substantial. For example, Richard Szulewski testified that the machete, which had been found in the springs of a couch in the alley behind Kinley's house, had the same distinctive handle markings as the machete that had hung in his garage prior to the day of the murders. Szulewski had had no doubt that it was, in fact, the same machete. Thus, even if we were to assume that helpful evidence might have been uncovered

by a metallurgist and that counsel should have sought out such evidence, we would not be inclined to conclude that, but for the omission, there was a reasonable probability that the outcome of Kinley's trial would have been different. Thus, Kinley's due process rights were not violated, and the trial court did not err in dismissing this claim without a hearing.

Next we turn to Kinley's contention that his attorneys were ineffective in failing to call Dawn Mitchell and Richard Howard as witnesses during the guilt phase of his trial because they would have testified that they had seen Thelma Miller with another man on the morning of her murder. Kinley presented affidavits from Mitchell and Howard in support of this claim. According to Kinley, this omission demonstrates a lack of due diligence on the part of his attorneys, rather than a strategic choice, because his "sole defense was that someone [else] committed the crime." Kinley's argument ignores one important aspect of these witnesses' statements: each claimed to have seem Thelma Miller *at Kinley's house* with another man on the morning of the murders. The state presented substantial evidence that Kinley had a violent temper, that he had been very jealous and possessive regarding Miller, and that he had threatened to kill her and her sons in the days preceding the murders after he found her with another man. Under these circumstances, Kinley's attorneys certainly could have made a strategic choice that the potential benefit of Mitchell's and Howard's testimony was outweighed by the risk that it would have established a motive for Kinley to commit the murders. The trial court was not required to conduct a hearing on this claim.

Kinley also asserted that he was entitled to a hearing regarding whether counsel should have more fully developed mitigation evidence during the sentencing phase of his trial. In support of this claim, he presented affidavits from several acquaintances and family members containing various allegations about his childhood. These allegations included: 1) there was some question about Kinley's parentage because he did not look very much like his father; 2) the men in Kinley's family prided themselves on their relatively fair skin and straight hair, but Kinley was very dark complected and had curly hair; 3) Kinley's brother was closer to their father and was treated better by him than Kinley was; 4) Kinley's parents' parenting skills were poor; 5) Kinley acted out to get attention; 6) a school principal yelled obscenities at Kinley once; 6) Kinley believed that his father did not love him; and 7) Kinley's parents hampered his defense. Kinley also presented affidavits from two psychologists. One psychologist stated that Kinley had suffered as a child from poor parenting, racism, and a poor self-image. The other stated that Kinley suffered from a mild neurological impairment associated with attention-deficit hyperactivity disorder and likely chemical abuse, which may have contributed to his behavioral problems.

As the trial court pointed out, Kinley would undoubtedly do things differently if he could try this case again. The additional mitigating evidence offered in support of his petition, however, was cumulative of the evidence offered at trial, which included Kinley's history and family background and expert testimony that he was learning disabled, had a mixed personality disorder with paranoid antisocial and explosive features, and was emotionally immature. On direct appeal, we found beyond a reasonable doubt that Kinley's age, his emotionally deprived childhood, his immaturity, and his personality disorder did not outweigh the aggravating circumstance. Likewise, the supreme court concluded that Kinley's family history was entitled to "very little weight in mitigation" and that the psychological evidence was entitled to "some, but very little, weight" because it failed to establish that he had lacked substantial capacity to conform his conduct to the requirements of the law. *Kinley*, 72 Ohio St.3d at 498, 651 N.E.2d 419, 425. Because the evidence offered in support of Kinley's petition was of like quality and nature to the evidence offered at trial, which evidence was entitled to little weight in mitigation, the attorneys' failure to present the additional evidence did not create substantive grounds for relief based on the ineffective assistance of counsel.

Kinley's final argument regarding the ineffective assistance of his counsel was that his attorneys did not apprise him of all the risks of waiving a jury, including the increased risk of being sentenced to death and the diminished opportunity for reversal on appeal. They did not tell him that, by waiving a jury, he was foregoing a two step sentencing process that would have required both the jury and the judge to agree to impose the death penalty. Kinley has cited no authority in support of his claims that he bore an increased risk of being sentenced to death by a three-judge panel or that the rate of reversal of jury verdicts is greater on appeal than of verdicts rendered by judges. Kinley's claim that he would not have waived his right to a jury if he had known that it would reduce his opportunity for reversal on appeal is the equivalent of arguing that he was deprived of his right to prejudicial error at trial. Furthermore, the trial court conducted an extensive colloquy with Kinley that apprised him of many of the facts of which he now claims he was unaware, such as the requirement that all twelve members of a jury agree on the verdict, rather than only three members of the panel. Kinley was not entitled to a hearing on these claims.

Kinley also argued that his attorneys were ineffective and that his waiver was not intelligently, voluntarily, and knowingly given because his attorneys had not explained to him the two step sentencing process in a capital case tried to a jury. In the two step sentencing process, if the jury does recommend the death penalty, the trial judge makes an independent assessment of whether the death

penalty is appropriate. In other words, both the jury and the judge must agree on the death penalty.

 Kinley argued on direct appeal that his jury waiver had not been intelligent, voluntary, and knowing because he had not been informed of this two step process. We rejected that argument. Thus, this claim was barred by *res judicata* and was properly dismissed. *Res judicata* did not bar Kinley's claim that trial counsel were ineffective in failing to inform him that he was waiving the two step sentencing process by waiving a jury trial because this claim was supported by evidence outside the record.

 In support of this ineffective assistance claim, Kinley offered his own affidavit stating that he had not been informed of the two step sentencing process and the affidavit of one of his attorneys stating that Kinley "may not have been made fully aware" of an extensive list of factors relevant to a jury waiver in a capital case. The attorney's affidavit suggests that any one of the considerations listed, including the two step sentencing process, "may not have been" discussed with Kinley, but it does not focus on the two step sentencing process specifically and does not affirmatively state that *any* of the information was necessarily omitted.

Even if we assume, for the sake of argument, that these affidavits created substantive grounds to believe that Kinley had not been expressly informed of the two step sentencing process, Kinley was not entitled to a hearing on this issue. Before accepting his jury waiver, the trial court informed Kinley that he had a constitutional right to have his case tried before a jury of twelve of his peers and that the state would be required to prove his guilt beyond a reasonable doubt to all twelve members of the jury. The trial court reiterated that "the jury has to unanimously agree that the State has proved it's [*sic*] case beyond a reasonable doubt as to each and every element of the charges against you in this indictment. * * * The jury has to unanimously agree, before they [*sic*] can return a verdict of guilty, as to the charges in the indictment and the specifications in the indictment." The trial court further explained:

"[T]his is a capital case and it carries a possible death penalty. So the right to trial by jury not only extends to the question of whether you're guilty or not guilty of the charges in the indictment, and any lesser offense, but it also extends to the additional question, if the jury returns a verdict of guilty on the offense of murder, there is a separate hearing where the jury would be asked to make a recommendation in regard to the penalty. * * * [I]f [the jurors] make a recommendation, for something less than a death penalty, that recommendation would be binding on the Judge."

Kinley repeatedly indicated that he understood the judge's explanation of the procedures and wanted to waive his right to a jury trial. As we observed in Kinley's direct appeal, "the trial court might have been clearer in [its] explanation that the jury's verdict also had to be unanimous as to the penalty to be imposed." Nevertheless, the trial court had immediately before unequivocally explained to Kinley that the jury had to be unanimous before it could return a guilty verdict. Given the trial court's emphatic discussion of the requirement of jury unanimity at the guilt phase, we are satisfied that Kinley understood that all twelve jurors would be required to agree on the death penalty before that penalty could be imposed. Given his willingness to forego the unanimous agreement of all twelve jurors on this issue, we find it implausible that Kinley would have chosen differently if only he had known that the judge would also be required to agree with the death sentence. The trial court was not required to conduct a hearing on this claim.

 Several of Kinley's other claims under this assignment of error implicate the extent to which the trial court was permitted to weigh the credibility of the affidavits offered in support of and in opposition to the petition in determining whether Kinley had set forth substantive grounds for relief. The Supreme Court has held that, because R.C. 2953.21 clearly calls for the trial court to exercise discretion in determining whether to grant a hearing on a petition for postconviction relief, the court cannot be required to accept as true all affidavits offered in support of such petitions. *Calhoun,* 86 Ohio St.3d at 284, 714 N.E.2d at 911. To hold otherwise, the court reasoned, would require a hearing for every postconviction relief petition and render meaningless R.C. 2953.21(D), which provides for motions for summary judgment. *Id.* at 284, 714 N.E.2d at 911. Accordingly, a trial court shall give due deference to affidavits sworn under oath and filed in support of a petition, but it may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact. *Id.*

In determining how to assess the credibility of supporting affidavits in postconviction relief proceedings, the Supreme Court adopted the reasoning of the First Appellate District in *State v. Moore* (1994), 99 Ohio App.3d 748, 651 N.E.2d 1319, which had looked to federal habeas corpus decisions for guidance. *Id.* at 753–754, 651 N.E.2d at 1322–1323. The Supreme Court ultimately determined that the trial court should consider all relevant factors in assessing the credibility of affidavit testimony in "so-called paper hearings," including the following:

"(1) whether the judge viewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the

petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony." *Calhoun,* 86 Ohio St.3d at 285, 714 N.E.2d at 911–912, citing *Moore,* 99 Ohio App.3d at 754–756, 651 N.E.2d at 1323–1324.

The Supreme Court further held that an affidavit, being by definition a statement that the affiant has sworn to be truthful under penalty of perjury, should not lightly be deemed false. *Id.* at 284, 714 N.E.2d at 911. A trial court that discounts the credibility of sworn affidavits must include an explanation of its basis for doing so in its findings of fact and conclusions of law in order that meaningful appellate review may occur. *Id.* at 285, 714 N.E.2d at 911–912; R.C. 2953.21(C).

A brief discussion of the facts of *Calhoun* and *Moore* will be instructive to our task of reviewing the trial court's determination that the affidavits offered in support of Kinley's petition for postconviction relief were not sufficiently credible to warrant a hearing.

Calhoun pled guilty to attempted aggravated murder, rape, and aggravated burglary as charged, in exchange for which the prosecutor requested dismissal of charges of kidnapping, aggravated robbery, theft, and felonious assault. Calhoun was sentenced to consecutive terms of ten to twenty-five years each on the attempted aggravated murder and rape charges and five to twenty-five years on the aggravated burglary charge. Six years later, Calhoun filed a petition for postconviction relief claiming that he had not knowingly, intelligently, and voluntarily entered his plea. Specifically, Calhoun claimed that his attorney had coerced him into pleading guilty and had represented him ineffectively by refusing to withdraw his guilty plea prior to sentencing, as Calhoun had requested. Calhoun also claimed that his attorney had represented that he would "most likely" be sentenced to a concurrent term of five to twenty-five years in prison. Calhoun's petition was supported by his own affidavit, his mother's affidavit, and portions of the record. The state presented an affidavit from Calhoun's trial counsel, which described the overwhelming evidence that led him to recommend a plea and denied offering any guarantee of what the sentence would be. The trial court dismissed Calhoun's petition for postconviction relief without a hearing.

The Supreme Court found that the trial court had not abused its discretion in dismissing the credibility of the defendant's affidavits and denying his petition without a hearing. The court noted that the judge who reviewed the petition had been the same judge who presided at Calhoun's plea and sentencing hearings and that he "was familiar with the underlying proceedings and was in the best

position to observe the defendant and his attorney and therefore assess the credibility of the affidavits." *Calhoun,* 86 Ohio St.3d at 286, 714 N.E.2d at 912–913. The court also observed that the affidavits relied on hearsay insofar as they related to the attorney's out-of-court statements and that the affiants were obviously interested in the success of the petition. Moreover, the plea transcript demonstrated full compliance with Crim.R. 11, wherein the defendant had assured the court that he had not been pressured into pleading guilty, had not been promised any particular sentence, and had understood the possible sentences that could be imposed.

Similarly, Moore claimed that his attorney had promised him probation if he pled guilty to attempted rape. He was sentenced to eight to fifteen years of incarceration. Moore filed a petition for postconviction relief supported by affidavits from his mother, brother, and sister. All three of Moore's affidavits gave verbatim accounts of the sequence of events involving the attorney's alleged promise of probation, including, in each instance, a first person account of having asked the attorney "what happened to the deal." The court noted that each of the affidavits was signed by a relative, that they seemed to have been prepared by the same person, and that they relied on hearsay. Moreover, the affidavits conflicted with Moore's prior statements in open court and, because the same judge had presided at the plea hearing and the postconviction proceeding, "the judge [had been] able to observe the defendant and his attorney and ascertain the credibility of the defendant's original statements." *Moore,* 99 Ohio App.3d at 755, 651 N.E.2d at 1324. The appellate court found that, under these circumstances, the trial court had not erred in dismissing the petition without an evidentiary hearing.

We now turn to the trial court's assessment of the credibility of the affidavits submitted in support of and in opposition to Kinley's petition for postconviction relief. In support of his claim that he was compelled to waive his right to a jury trial in exchange for funding for an expert witness, Kinley presented affidavits from his lead defense attorney at trial, James A. Doughty, and from co-counsel John R. Butz. Doughty stated that Kinley's attorneys had been able to obtain the funding to hire a mental health expert for the mitigation phase of the trial only by agreeing to waive a jury trial. According to Doughty, the prosecutor had opposed and Judge Lorig had repeatedly denied motions for funding for the expert. Finally, at an off-the-record conference in Judge Lorig's chambers, Butz suggested to Assistant Prosecutor David Smith that "we would waive the jury if he would stop opposing funding" for the expert. The prosecutor agreed to this deal, and the judge "approved the deal" and subsequently granted funding for the expert. Doughty's affidavit states, "We suggested this bargain because we thought it was the only way we could get funding for a psychologist.

It was not a strategic choice. We were forced into offering this bargain because of Judge Lorig's intransigence over approving funding for a psychologist." Butz corroborated this version of events, stating that "waiving a jury was the event which caused Judge Lorig to approve funding for the employment of a psychologist."

In response, the state presented affidavits from Judge Lorig and Prosecutor David Smith. Judge Lorig stated that his decision to grant funding for an independent psychological expert for mitigation "was entirely unrelated to and separate from any discussion regarding the jury waiver." Smith stated that he had not proposed any bargain or deal to Kinley's defense counsel whereby the state would stop opposing funding for a mental health expert in exchange for a waiver of a jury trial. He stated that he did not recall whether Kinley's attorneys had approached him with such an offer.

In rebuttal, Kinley presented additional affidavits from Doughty and Butz stating that they had reviewed Judge Lorig's and Smith's affidavits, disputed Judge Lorig's and Smith's versions of events, and stood by their original statements.

In our view, the trial court was not in a position reasonably to assess the credibility of these conflicting affidavits without conducting a hearing. Although in his jury waiver and colloquy with the judge, Kinley stated that he knowingly, intentionally, and voluntarily waived his right to a jury trial, Kinley presented substantive evidence outside of the record that he had been required to bargain away his right to a jury in exchange for an expert for the mitigation phase of the trial. The judge who ruled on the petition for postconviction relief had not participated in the trial and had no basis upon which to weigh the credibility of the conflicting affidavits without observing and examining the affiants. Furthermore, the defense attorneys had no personal interest in the success of Kinley's petition, and their affidavits were entitled to greater weight than Kinley's self-serving affidavit. See State v. Kapper (1983), 5 Ohio St.3d 36, 38, 5 OBR 94, 96, 448 N.E.2d 823, 825–826 (letter or affidavit from the court, prosecutors, or defense counsel alleging a defect in the plea process might be sufficient to warrant a hearing, although defendant's own affidavit alleging same defect would not, because the former are not self-serving declarations). The information in the affidavits of Doughty and Butz, if true, demonstrated a possible constitutional violation.

Under these circumstances, we cannot approve the trial court's summary rejection of sworn affidavits from Kinley's two trial attorneys. The trial court should have conducted a hearing on this issue. We recognize, however, that the jury waiver may have been inevitable aside from the alleged deal for an expert. In light of the gruesome nature of the crime, trial counsel might have reasonably

concluded that Kinley's interests would be better served by dispassionate judges than by a jury regardless of whether they could obtain an expert in exchange for the jury waiver. Indeed, counsel may have already been inclined to waive the jury when it suggested the waiver in exchange for an expert, thereby using the waiver to its maximum advantage. The trial court should consider all of these factors when it conducts a hearing on the circumstances surrounding the jury waiver.

We next turn to the trial court's assessment of the credibility of Merriman's and Bishop's affidavits recanting their testimony at trial. We note, as a preliminary matter, that recanted testimony is looked upon with the utmost suspicion. *Taylor v. Ross* (1948), 150 Ohio St. 448, 38 O.O. 314, 83 N.E.2d 222, paragraph three of the syllabus; *State v. Isham* (Jan. 24, 1997), Montgomery App. No. 15976, unreported, 1997 WL 24794; *State v. Germany* (Sept. 30, 1993), Cuyahoga App. No. 63568, unreported, 1993 WL 389577, citing *United States v. Lewis* (C.A.6, 1964), 338 F.2d 137, 139.

Bishop testified at trial that, on the day of the murders, Kinley had been at Bishop's home in the morning from "a little bit after nine or quarter till ten" until "a little bit after ten, a quarter till 11," had left for a short while, and had returned "a little bit after 11 or about a quarter til 12." Bishop testified that, when Kinley came to the house the second time, he had carried money in his hand in a bank envelope. Bishop then identified a specific type of bank envelope from among several choices that matched the one Kinley had carried. Bishop also testified that, on the latter occasion, Kinley had possessed a set of keys that differed from keys he had carried earlier in the day. A bank envelope like the one Bishop identified and a set of keys had been missing from the scene of the murders. Bishop also stated that Kinley seemed to have worn the same clothing all day, that Bishop had not seen any blood on the clothing, and that Kinley's behavior was substantially the same during both of their encounters that day.

In his affidavit in support of Kinley's petition for postconviction relief, Bishop stated that he had seen Kinley on the day of the murders at approximately 9:00 a.m. and again "just after" 5:00 p.m. Bishop stated that Kinley had not carried money in a bank envelope on the day in question and that Bishop had identified "the flowered envelope in court * * * just * * * so that [he] could get off the stand and out of court." Bishop also stated that he had never seen Kinley with an extra set of keys on the day of the murders.

The state rebutted Bishop's affidavit with affidavits from Sergeant Carl Loney and Detective Ron Rude. Loney stated that he had questioned Bishop about the events of January 10, 1991, about two months after the murders, at which point Bishop had claimed that he had seen Kinley with money in a bank envelope and a set of keys with a small shoe or skateboard attached to it on the day of the

murders. Bishop had stated that the bank envelope was white with red lettering. When questioned again the next day, Bishop described the bank envelope as having had a red flower on it. He later identified a Society Bank envelope with a flower on it from among an array of bank envelopes collected by Loney as being like the one Kinley had carried on January 10, 1989. Detective Rude's affidavit similarly stated that, when questioned, Bishop had reported seeing Kinley on January 10, 1989, in possession of a bank envelope with money in it and a set of keys with a shoe or skateboard attached, and that Bishop had described that envelope as being white with red lettering.

■ Considering the factors set forth in *Calhoun*, 86 Ohio St.3d at 285, 714 N.E.2d at 911–912, we conclude that Kinley was entitled to a hearing regarding Bishop's recanted testimony. The judge who presided at the postconviction proceeding was not one of the judges at Kinley's trial, so he was not in a position to weigh the credibility of Bishop's affidavit against his credibility on the witness stand. It is not apparent that Bishop had any personal interest in the success of Kinley's petition. Moreover, the affidavit of Detective Rude uses exactly the same language as portions of Sergeant Loney's affidavit, giving rise to an inference that they were drafted by the same person. Although this parallel does not undermine the credibility of the affidavits *per se*, it is a factor mentioned in *Calhoun* as tending to weaken the credibility of affidavit testimony. Furthermore, because Bishop's trial testimony connected Kinley with a bank envelope like the one that was reported missing from the residence where the murders had occurred, we are hesitant to conclude that the veracity of his affidavit was inconsequential. See *id.* at 284, 714 N.E.2d at 911. For these reasons, although we are duly skeptical of Bishop's recanted testimony, we think that Kinley was entitled to a hearing on this issue.

■ Kinley also asserts that he was entitled to a hearing regarding Merriman's recanted testimony. Merriman, who had known Kinley since childhood, testified at trial that he had encountered Kinley in late January 1989, and had had a few drinks and conversed with him. At that time, Merriman had just returned to Dayton from Milwaukee and had been unaware of the murders of Thelma and David Miller. According to Merriman's trial testimony, Kinley had asked him whether he had ever killed someone, then admitted that he had killed his girlfriend and her son. Kinley also mentioned having had blood on the steering wheel of his car that his mother had tried to help him clean up. Merriman testified that, at the time, he had not believed Kinley. Then, when Merriman was in jail on unrelated charges in March 1989, he heard a news report about the murder of a woman and her son in which Kinley was named as a suspect. Merriman stated that he went to the police at that time because he felt "it was the right thing to do." According to his trial testimony, Merriman had

not attempted to bargain with the prosecutor for favorable treatment in his own case in exchange for his testimony against Kinley because he "kn[e]w the prosecutor's office didn't make deals." In his affidavit, Merriman recanted his trial testimony as follows:

"That testimony was given solely to help my own case and to facilitate my receiving a reduced sentence. Juan Kinley and I did not have a conversation in January of 1989. In fact, until I saw him in jail after he was arrested, I had not seen him in years."

We turn to the factors set forth in *Calhoun,* and other relevant factors weighing on the credibility of Merriman's affidavit to determine whether Kinley was entitled to a hearing on this issue. It is not apparent that Merriman has any personal interest in the success of Kinley's petition, and the affidavit is consistent with defense counsel's efforts at trial to suggest that Merriman invented his story for his own personal gain. Moreover, although Merriman's detailed account at trial of his encounter with Kinley tended to lend it credibility, there was no evidence to corroborate that the alleged conversation had actually occurred. The prosecutor's affidavit refuted Merriman's claim that he had made a deal in exchange for helpful testimony, as did Merriman's trial testimony, but Merriman may nonetheless have *hoped* that he would receive favorable treatment if he helped the prosecution's case against Kinley. There does appear to have been a significant delay between the time Merriman entered his plea and his sentencing, during which time he testified at Kinley's trial. The trial judge who denied postconviction relief relied heavily upon its own assessment of Merriman's credibility in determining which of his accounts to believe, notwithstanding the fact that the judge reviewing the petition for postconviction relief did not participate in the trial and had not observed Merriman's demeanor firsthand. Under these circumstances, we think that the trial court should not have discredited Merriman's affidavit without a hearing.

 Kinley also contended that he did not knowingly, voluntarily, and intelligently waive the conflict of interest that was created by the Clark County Public Defenders' representation of him and of Merriman. Merriman had several forgery charges pending in early 1989, at which time he was represented by the Public Defender's Office. The Public Defender's Office withdrew from its representation of Merriman shortly before the indictment against Kinley was filed, apparently in anticipation of that indictment. This dual representation, if it can even be characterized as that, certainly did not prejudice Kinley.

In October 1990, the Clark County Public Defender's Office withdrew from representing Kinley, and the Public Defender's Office apparently agreed to represent Merriman on a new charge in November 1990. Someone from the Public Defender's Office later cross examined a DNA expert on behalf of Kinley

at trial. On this occasion, the record demonstrates that the court informed Kinley of the potential conflict with the Public Defender's representation of Merriman and obtained Kinley's consent to the Public Defender's limited participation at trial. Because Kinley's affidavit claiming that he was unaware of the public defender's representation of Merriman is refuted by the record, the trial court was not required to conduct a hearing on this claim.

Finally, Kinley claimed that his constitutional rights were violated because the Clark County Prosecutor applied the death penalty in a racially discriminatory manner. Kinley also claimed that his sentence was not proportionate to the sentences of others who had committed similar crimes. We considered the proportionality of Kinley's sentence on direct appeal, and we will not address that issue again. Kinley supports his claim that the death penalty is applied in a racially discriminatory manner in Clark County by pointing out that the percentage of African Americans on death row is greater than the percentage of African Americans in the general population and that he, an African American, was the only person ever sentenced to death in Clark County. We find neither of these statistics to be compelling evidence of racism in Kinley's case. These statistics do not account for the heinous nature of Kinley's crime, which may have been unparalleled in Clark County history. It is hard to imagine a crime for which the death penalty would be appropriate if not the Millers' murders. As such, we will not presume that the prosecutor's decision to seek the death penalty was racially motivated without specific evidence tending to substantiate such a claim. Because Kinley has pointed to no such evidence in this record, the trial court was not required to conduct a hearing on this claim.

Kinley's first assignment of error is sustained in part and overruled in part.

II. "The trial court erred in denying appellant Kinley discovery on his post–conviction claims in violation of his constitutional rights, as guaranteed by the United States and Ohio Constitutions."

Kinley claims that the trial court erred in denying him leave to conduct discovery before ruling on his petition. Kinley sought to take numerous depositions and to obtain various other records. He asserts that, because discovery is routinely granted in other civil proceedings, it should have been granted in this case.

Civ.R. 1(A) provides:

"These rules prescribe the procedure to be followed in all courts of this state in the exercise of civil jurisdiction at law or in equity, with the exceptions stated in subdivision (C) of this rule."

Civ.R. 1(C) provides that the civil rules, "to the extent that they would by their nature be clearly inapplicable, shall not apply to procedure * * * in all other special statutory proceedings." Postconviction proceedings are special statutory proceedings, and R.C. 2953.21 makes no provision for the application of the Ohio Rules of Civil Procedure. Thus, we have held that the civil rules do not entitle a petitioner to discovery in postconviction proceedings. *State v. Chinn* (Aug. 21, 1998), Montgomery App. No. 16764, unreported, 1998 WL 518073. See, also, *State v. Smith* (1986), 30 Ohio App.3d 138, 140, 30 OBR 256, 258–259, 506 N.E.2d 1205, 1207–1208; *State v. Spirko* (1998), 127 Ohio App.3d 421, 713 N.E.2d 60. The trial court was not required to allow Kinley to conduct extensive discovery in support of his petition.

The second assignment of error is overruled.

III. "The trial court erred in issuing insufficient findings of fact and conclusions of law regarding appellant's petition for post–conviction relief."

Kinley claims that his constitutional rights were violated because the trial court adopted findings of fact and conclusions of law drafted by the state. Kinley asserts that the trial court's findings of fact and conclusions of law were inadequate because they did not demonstrate that the court reached its own, independent conclusion and because they did not provide sufficient reasoning to allow for meaningful appellate review.

A trial court's adoption of the findings of fact and conclusions of law submitted by the state does not, by itself, deprive a petitioner of a meaningful review of a petition for postconviction relief and does not constitute error in the absence of demonstrated prejudice. *State v. Powell* (1993), 90 Ohio App.3d 260, 263, 629 N.E.2d 13; *State v. White* (Aug. 7, 1998), Ashland App. No. 97 COA 1229, unreported, 1998 WL 515944; *State v. DeBlanco* (July 14, 1998), Franklin App. No. 97APA08–1049, unreported, 1998 WL 400564. Furthermore, the findings of fact and conclusions of law were sufficiently specific to enable appellate review.

The third assignment of error is overruled.

The judgment of the trial court will be reversed in part and remanded for a hearing on Kinley's claim that he waived his right to a jury trial in exchange for expert testimony and on his claim that two witnesses committed perjury at trial. In all other respects, the judgment of the trial court will be affirmed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

GRADY, P.J., and BROGAN, J., concur.