OPINION
{¶ 1} Defendant, Larry Gapen, appeals from a summary judgment in favor of the State on Gapen's petition for post-conviction relief, which was entered by the court without a hearing.
 {¶ 2} The facts of this case are set forth in the trial court's Decision, Order and Entry granting the State's motion for summary judgment:
 {¶ 3} "Larry Gapen and Martha Madewell were married in 1993. Martha had four children from prior relationships, Daniel Marshall, Jesica Young, Brooke Madewell and Billy Madewell. Gapen had two children from his second marriage, Charity and Jimmy Gapen. Gapen and Martha moved in together, with their children, in August 1993. Charity Gapen left the house in June 1997. Gapen and Martha began to have difficulties and the relationship between the two families deteriorated. Jimmy and Larry Gapen moved into Charity's apartment at 132 Brusman Drive in Vandalia, Ohio in April of 2000. Gapen and Martha continued to see each other periodically after their separation. However, they signed a separation agreement on June 16, 2000 in anticipation of terminating their marriage.
 {¶ 4} "On June 24, 2000, Gapen broke into Martha's home. He stated that he entered the home so he could discuss their relationship with Martha. Gapen stated that he tied Martha's legs together because he was afraid she would leave. Subsequently, Gapen was charged with abduction. Gapen was released on bond, including electronic home detention at Charity's home as a condition of that bond. Also as a condition of bond, Gapen signed documents agreeing not to leave his daughter's home except when he was working. However, Gapen regularly left his daughter's home to do things other than to work, including visiting Martha and her children. Gapen also helped Martha move to a new house at 6255 Pheasant Hill Road in Dayton, Ohio. Gapen and Martha filed the Decree of Dissolution to terminate their marriage on September 14, 2000. On September 17, 2000, Martha brought home her ex-husband Nathan Marshall, and introduced him to her son, Daniel. At 7:30 p.m., on September 17, evidence at trial showed that Gapen was at Martha's home and saw her lying on the couch with an unfamiliar man. At 8:00 p.m., that same day, Gapen had dinner with his son Jimmy and Jimmy's girlfriend, Kacee Miller. Jimmy and his girlfriend stated that Gapen was in good spirits and that he did not express any sadness or anger over his relationship with Martha. Jimmy stated that Gapen acknowledged he knew Martha was seeing another man but he was `okay with it.'
 {¶ 5} "According to the testimony at trial, Gapen told police officers that he returned to Martha's house at 12:30 a.m., on September 18, 2000. Martha and her ex-husband, Nathan, were still asleep on the couch. Gapen took a chopping maul and beat Martha, Nathan Marshall and Jesica, inflicting fatal injuries. Gapen also later admitted to police that he had sexual relations with Martha after hitting her.
 {¶ 6} "Martha's younger daughter, Brooke, was asleep in her bedroom located in the basement. She awoke to banging sounds coming from the next room. Nine-year-old Brooke opened her bedroom door and recognized Gapen. She saw that he had an axe and saw him hit something. Gapen saw Brooke and told her to go back to bed. Gapen told Brooke to get her clothes and go upstairs because her mother asked him to take her and her brother Billy to school the next day. Brooke got dressed, packed her bag and went upstairs.
 {¶ 7} "Martha's son Daniel was awakened by Jesica's cries in the next room. Daniel said the clock on his desk read 1:51 A.M. Daniel opened his bedroom door and saw Gapen in the hallway. Gapen told Daniel to go back to sleep, which he did. Gapen later revealed to the police that he attacked Jesica because she had been disrespectful to him and `would talk back to him.' He also later told detectives that `she was going to turn out just like them.' Gapen left the chopping maul in the upstairs bathroom and left the house with Brooke and Billy. Daniel got up again a few minutes later and noticed that the back door was open. He turned the lights on and found his mother and Nathan dead in the basement. He ran upstairs and saw Jesica bleeding, but still alive in her room. Daniel then called 911. The paramedics took Jesica to the hospital where she died from her injuries.
 {¶ 8} "The police began looking for Gapen after Daniel's 911 call. They followed Gapen's car to a donut shop in Vandalia. Officers surrounded Gapen's car, with guns drawn, and ordered him out of the car. He exited the car and was arrested at approximately 7:30 A.M. on Monday, September 18, 2000 without incident. Brooke and Billy were in the back of Gapen's car. Gapen stated he had driven them to the donut shop because Billy said he was hungry. After his arrest, Gapen described the events that had occurred that evening to Detectives Salyer and Elzholz." (Decision, Order and Entry, pp. 1-4).
 {¶ 9} On October 18, 2000, Defendant was charged in a sixteen count indictment with escape, aggravated burglary, aggravated robbery, rape, and twelve counts of aggravated murder. There were four counts of aggravated murder pertaining to each of the three victims, and each count included five aggravating circumstance (death penalty) specifications.
 {¶ 10} On June 16, 2001, following a jury trial, Defendant was found guilty of all of the indicted charges, except rape, and all of the death penalty specifications. Following the penalty phase of the trial, the jury recommended that Defendant be sentenced to death for the aggravated murder of Jesica Young committed with prior calculation and design. On all of the other counts of aggravated murder, the jury recommended that Defendant be sentenced to life imprisonment without the possibility of parole.
 {¶ 11} On July 3, 2001, the trial court accepted the jury's recommendation and sentenced Defendant to death for the murder of Jesica Young, and life in prison without parole for the murders of Martha Madewell and Nathan Marshall. The trial court also imposed additional consecutive prison terms totaling twenty-five years on the underlying felony offenses.
 {¶ 12} On direct appeal the Ohio Supreme Court dismissed the escape charge and the death penalty specifications relating thereto, but affirmed Defendant's other convictions and the sentence of death arising from the murder of Jesica Young. State v. Gapen, 104 Ohio St.3d 358,2004-Ohio-6548.
 {¶ 13} On October 4, 2002, Defendant filed a petition for post-conviction relief pursuant to R.C. 2953.21. On December 16, 2002, the State filed a motion for summary judgment on the petition. On March 11, 2004, the trial court granted the State's motion and dismissed Defendant's postconviction petition without a hearing.
 {¶ 14} Defendant timely appealed to this court from the dismissal of his post-conviction petition.
 {¶ 15} FIRST ASSIGNMENT OF ERROR
 {¶ 16} "The trial court erred by dismissing appellant's postconviction petition, where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery."
 {¶ 17} R.C. 2953.21 governs post conviction relief and provides in pertinent part:
 {¶ 18} "Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. * * *
 {¶ 19} "* * * Before granting a hearing, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition and supporting affidavits, all the files and records pertaining to the proceedings against the petitioner[.] * * *
 {¶ 20} "Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing[.] * * *" R.C 2953.21(A)(1), (C), and (E).
 {¶ 21} R.C. 2953.21 imposes on a petitioner the initial burden to submit evidentiary documents containing operative facts sufficient to demonstrate substantive grounds for relief that merit a hearing. Statev. Jackson (1980), 64 Ohio St.2d 107, 111; State v. Kapper (1983),5 Ohio St.3d 36, 38; State v. Pankey (1981), 68 Ohio St.2d 58, 59. A hearing is not required absent a showing that substantive grounds for relief exist. State v. Moreland (Jan. 7, 2000), Montgomery App. No. 17557. Broad conclusory allegations are insufficient, as a matter of law, to require a hearing. Id. A petitioner is not entitled to a hearing if his claim for relief is belied by the record and is unsupported by any operative facts other than Defendant's own self-serving affidavit or statements in his petition, which are legally insufficient to rebut the record on review. Kapper, supra; State v. Vanderpool (Feb. 12, 1999), Montgomery App. No. 17318.
 {¶ 22} In his second, third and fourth grounds for relief in his petition, Defendant claimed that he was denied due process and a fair sentencing hearing because of juror misconduct. Specifically, Defendant claims that the jurors ignored the trial court's instructions and (1) improperly considered non-statutory aggravating circumstances in deciding whether to impose the death penalty, (2) improperly considered evidence other than evidence admitted during the trial, and (3) failed to keep an open mind and had their minds made up about which penalty to impose at the conclusion of the guilt phase, thereby failing or refusing to consider relevant mitigating evidence during the penalty phase.
 {¶ 23} In support of his claim of juror misconduct, Defendant submitted an affidavit of Kathryn Sanford, an attorney with the Ohio Public Defender's Office, who was present during an interview with two of the jurors in Defendant's case, Raymond Senter and Mark Maguire. Attorney Sanford's affidavit states that juror Senter said that, for him, the primary aggravating circumstance that weighed in favor of death was the "premeditation" of the crimes. Premeditation is not one of the statutory aggravating circumstances supporting imposition of the death penalty. See R.C. 2929.04(A). Juror Senter also said that after the evidence was presented in the guilt phase relevant to the attack on thirteen year old Jesica Young, he had made-up his mind at that point to vote for the death penalty. Additionally, Juror Senter said that a fellow juror, David Nedostup, had conducted his own independent research in the Bible on the death penalty and shared that information with the other jurors during deliberations.
 {¶ 24} According to Attorney Sanford's affidavit, Juror Maguire stated that the most significant aggravating circumstances for him that weighed in favor of death was the "cold-bloodedness" of the crimes and its "premeditation." Those are not statutory aggravating circumstances, either. Juror Maguire confirmed that fellow juror David Nedostup had researched biblical passages on the death penalty and shared that information with the other jurors.
 {¶ 25} Defendant also submitted an affidavit from Dorian Hall, who works in the criminal investigation unit of the Ohio Public Defender's Office. Hall was present during an interview with one of the jurors in Defendant's case, David Nedostup. According to Hall's affidavit, Juror Nedostup indicated that if a person is guilty of murder then in his view death is the only appropriate sanction. Nedostup also indicated that he had made up his mind to vote for the death penalty for the murder of Jesica Young at the end of the guilt phase.
 {¶ 26} As further support for his claim, Defendant submitted an affidavit from Michael Geis, a professor of linguistics at Ohio State University. Professor Geis states in an affidavit prepared in 1994 that the instructions found in Ohio Jury Instructions that apply to the penalty phase of a capital case encourage jurors to consider non-statutory aggravating circumstances.
 {¶ 27} Defendant also submitted an affidavit from William Emmons, a juror in the capital trial of RayShawn Johnson that was tried in Hamilton County, Ohio. Emmons states that the "viciousness" of the crime weighed heavily in favor of his decision to recommend death. Viciousness is not a statutory aggravating circumstance supporting imposition of the death penalty.
 {¶ 28} Absent competent evidence to the contrary, it is presumed that jurors follow the trial court's instructions. State v. Brown (July 14, 2000), Montgomery App. No. 17891. The trial court could, as it did, find that the Stanford and Hall affidavits failed to present the competent evidence required to overcome the presumption because the affiants lacked personal knowledge of the misconduct alleged. The court could, as it also did, reject the Geis and Emmons affidavits on relevance because they were not specifically concerned with the proceedings leading to Defendant-Appellant's conviction, and therefore fail to portray the substantive grounds for relief required by R.C. 2953.21.
 {¶ 29} In his first and fifth grounds for relief in his petition, Defendant claims he was prejudiced by the ineffective assistance of his trial counsel during both the guilt and penalty phases of the trial.
 {¶ 30} In order to demonstrate ineffective assistance of trial counsel, Defendant must demonstrate that counsel's performance was deficient and fell below an objective standard of reasonable representation, and that Defendant was prejudiced by counsel's performance; that is there is a reasonable probability that but for counsel's unprofessional errors, the result of Defendant's trial or proceeding would have been different. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of reasonable assistance. Id.
Moreover, hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.
 {¶ 31} With respect to the guilt phase of the trial, Defendant claims that his trial counsel performed deficiently by failing to call him to testify when he was the only person who could have provided evidence to support his theory of the case that he did not act purposely in committing these killings with prior calculation and design.
 {¶ 32} The defense theory at trial was that Defendant did not kill the victims purposefully, with prior calculation and design, but rather that he snapped and committed a "crime of passion" when he discovered his ex-wife in bed with another man. The State's evidence, on the other hand, indicated that Defendant had seen his ex-wife and the other man in bed together around 7:30 p.m., then left the house and brooded for hours before finally returning around midnight and killing the victims.
 {¶ 33} According to Defendant's postconviction affidavit, he told his attorneys that he only saw his ex-wife talking to the other man earlier in the evening. Defendant left and came back around midnight, expecting that the man would be gone and he could talk to his ex-wife. When he instead discovered the two of them in bed together, Defendant snapped. He then obtained the murder weapon and killed the victims in a fit of passion. Defendant argues that because his testimony was the only evidence that could support his theory of the case, defense counsel performed deficiently in failing to call him to testify.
 {¶ 34} The right to testify is a personal right that is exercised or waived by the client, not the attorney. Absent evidence to the contrary, a reviewing court must presume that a defendant's failure to testify was the result of his own knowing, intelligent decision to exercise his privilege against self-incrimination. State v. Copeland (January 18, 2002), Montgomery App. No. 18711; State v. Carter (1996),115 Ohio App.3d 770, 776.
 {¶ 35} The affidavit Defendant submitted in support of this ineffective counsel claim merely states that he would have testified at trial had he been asked to do so by his attorneys. That falls far short of demonstrating that Defendant wished to testify at trial, or that he was prevented or discouraged in any way from doing so by his attorneys. Defendant failed to present sufficient evidence to rebut the presumption that his failure to testify at trial was the result of his own knowing, intelligent decision. Thus, Defendant has not presented sufficient evidence to demonstrate deficient performance by defense counsel in failing to call Defendant to testify that might require a hearing.
 {¶ 36} Defendant's postconviction affidavit also fails to establish any prejudice. Even assuming that Defendant would have testified at trial consistent with the statements in his post-conviction affidavit, those alleged facts do not demonstrate that Defendant did not act with prior calculation and design. To the contrary, prior calculation and design can be formed quickly over a very short period of time, even when the killer quickly conceived and executed the plan to kill within a few minutes.State v. Coley, 93 Ohio St.3d 253, 263-264, 2001-Ohio-1340; State v.Palmer, 80 Ohio St.3d 543, 567-568, 1997-Ohio-312; State v. Robbins
(1979), 58 Ohio St.2d 74, 79. Even accepting as true Defendant's version of the facts set forth in his affidavit, the jury could reasonably conclude that Defendant acted with prior calculation and design in committing these killings. Thus, there is no reasonable probability of a different outcome, even had Defendant testified to the facts related in his affidavit. Defendant has failed to present sufficient evidence to demonstrate either deficient performance by counsel or resulting prejudice. No substantive grounds for relief are demonstrated.
 {¶ 37} With respect to the penalty phase of the trial, Defendant claims that his counsel performed deficiently when they failed to present relevant mitigating evidence in the form of expert opinion testimony by a psychologist explaining why Defendant murdered his thirteen year old stepdaughter, Jesica Young for whose murder Defendant was sentenced to death.
 {¶ 38} Defendant received the death penalty for killing Jesica Young, "with prior calculation and design." The defense strategy during the guilt and penalty phases of trial was to attempt to convince the jury that Defendant is an average person who did not suffer from any mental illness, but who was put under extreme emotional stress as a result of his failed relationship with his ex-wife, Martha Madewell, and that he simply reached the breaking point, lost control and snapped, committing a "crime of passion" when he discovered Martha Madewell in bed with Nathan Marshall. While that theory might satisfactorily explain why Defendant murdered Madewell and Marshall, as evidenced by the jury's recommendation of life sentences for those killings, but it does not explain why after he killed Madewell and Marshall in the basement Defendant then walked upstairs to the bedroom of his thirteen year old stepdaughter, Jesica Young, and murdered her. Defense counsel offered the jury no explanation for why Defendant killed Jesica Young, and did not even mention the killing of Young in their penalty phase closing argument.
 {¶ 39} In affirming Defendant's death sentence for the murder of Jesica Young, the Ohio Supreme Court noted that the jury may have found Gapen's decision to murder Jesica was not mitigated at all. State v.Gapen, supra, 2004-Ohio-6548 at ¶ 140. The Supreme Court further observed that Gapen's claim that these killings were a "crime of passion" provides no mitigating reason for murdering Jesica. Defendant's only explanation to police for why he killed Jesica was that she would "never give him any respect" and she was "going to turn out just like them."Id., at ¶ 176.
 {¶ 40} During the penalty phase the defense presented the expert psychological testimony of Dr. Robert Smith to show that Defendant is an average, normal person who did not suffer from any mental illness or defects. As Dr. Smith's post-conviction affidavit makes clear, however, defense counsel never discussed with Dr. Smith the issue of Jesica Young's murder, or why Defendant attacked her after killing his ex-wife and her lover, and Dr. Smith was not asked anything about that and therefore did not address the issue at trial. In his affidavit Dr. Smith indicates that had defense counsel asked him about Jesica Young's death, he would have offered this explanation for why Defendant attacked her:
 {¶ 41} "8. I would have told the jurors that, based on my evaluation of Mr. Gapen as noted in my mitigation testimony, I concluded that Mr. Gapen was obsessed with making his relationship with his wife Martha work. Dealing with Jesica was one of the obstacles that led to the breakup of the marriage.
 {¶ 42} "9. I would have further explained the concept of enmeshed relationships. Mr. Gapen was obsessed with Martha; he blamed her older children for the problems in his marriage. Mr. Gapen distorted reality and transferred his emotions to the children, including Jesica.
 {¶ 43} * * *
 {¶ 44} "11. One of the primary areas of conflict in the marriage was Martha's children from earlier relationships. The older children did not accept Mr. Gapen as a father figure and refused to follow his direction. The children complained about him to Martha and she repeatedly took their side and confronted him as being too harsh with her children.
 {¶ 45} "12. As the children realized that Martha would side with them against Mr. Gapen, they escalated their behavior, acting out and manipulating Martha to attain their own way. This caused repeated disagreements between Martha and Larry.
 {¶ 46} "13. Mr. Gapen was too enmeshed with Martha to see her dysfunction or to leave her. Consequently, he blamed her children for the marriage failing.
 {¶ 47} "14. At the time of my evaluation of Mr. Gapen, he indicated to me that he felt that Jesica was the "mirror image" of Martha, and, in discussing Jesica, he presented as projecting the anger he felt toward Martha onto Jesica.
 {¶ 48} * * *
 {¶ 49} "16. In my professional opinion, the attack on Jesica was not a conscious decision. Rather, it flowed from the emotions Mr. Gapen had toward Martha and was the culmination of a sequence of events that Mr. Gapen could not control at that point." (Smith Affidavit, ¶ 8, 9, 11, 12, 13, 14, 16.)
 {¶ 50} The essence of the testimony Dr. Smith said he would have given if asked by defense counsel to explain why Defendant attacked Jesica Young is that her killing was not done consciously, with prior calculation and design, but that it, like the killings of Madewell and Marshall, was a crime of passion that resulted from Defendant's projecting the anger he felt toward Martha Madewell onto her daughter, Jesica Young, whom Defendant believed was the "mirror image" of Martha.
 {¶ 51} The State argues that Dr. Smith's opinion testimony in his affidavit would have been inconsistent with the defense theory of this case: that Defendant was an ordinary reasonable person without any mental illness or defects. Dr. Smith's affidavit indicates that Defendant was obsessed with making his relationship with Martha Madewell work, and because of that Defendant blamed Madewell's older children, including Jesica Young, for the failure of his marriage. Defendant distorted reality and misdirected the anger he felt toward Martha Madewell onto her daughter, Jesica Young. Thus, the State claims that it was an objectively reasonable trial strategy for defense counsel not to present the testimony set forth in Dr. Smith's affidavit. We disagree.
 {¶ 52} Dr. Smith testified at the penalty phase about Defendant's obsessive personality traits and the fact that prior to these crimes he had not coped well with his failing relationship with Martha Madewell. Dr. Smith's opinion testimony in his affidavit is consistent with the defense theory that Defendant finally reached the breaking point in his relationship with Madewell and exploded, committing an uncharacteristic act, a crime of passion, not a planned murder. Dr. Smith's affidavit explains how the stress and emotions and anger Defendant experienced as a result of his failed relationship with Madewell transferred to her children, including Jesica, resulting in another crime of passion instead of a premeditated murder.
 {¶ 53} Defense counsel presented some evidence during the penalty phase about the conflict between Defendant and Martha Madewell's older children and how that adversely affected Defendant and Madewell's marriage, and the fact that Defendant blamed the children for those problems. However, that is not the same evidence or have the same probative value and impact as the testimony in Dr. Smith's affidavit, which offers an opinion from an expert witness explaining why Defendant attacked and killed his thirteen year old stepdaughter. Simply put, Dr. Smith's opinion testimony ties the "crime of passion" mitigation evidence that applies to the killings of Martha Madewell and Nathan Marshall to the killing of Jesica Young as well. Absent this explanation for what compelled Defendant to attack Jesica Young, the jury was left without any reason or mitigating evidence for the killing, which may explain why the jury recommended a death sentence for the murder of Jesica Young but not the murders of Martha Madewell and Nathan Marshall, though all three were a part of the same crime spree and very close in time.
 {¶ 54} We conclude that Defendant presented sufficient evidence to demonstrate deficient performance by defense counsel and that he was prejudiced thereby. In other words, Defendant has presented sufficient operative facts to demonstrate substantive grounds for relief on this particular ineffective assistance of counsel claim. Accordingly, Defendant was entitled to a hearing on this claim, and the trial court erred in summarily dismissing his petition without a hearing.
 {¶ 55} The first assignment of error is sustained, in part. The judgment of the trial court dismissing Defendant's post conviction petition without a hearing will be reversed, and this matter remanded to the trial court for a hearing on Defendant's claim that his trial counsel rendered ineffective assistance by failing to present as relevant mitigating evidence Dr. Smith's opinion testimony explaining why Defendant attacked and killed his stepdaughter, Jesica Young.
 {¶ 56} SECOND ASSIGNMENT OF ERROR
 {¶ 57} "Ohio's postconviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the fourteenth amendment."
 {¶ 58} Defendant argues that Ohio's postconviction process is inadequate and does not comport with due process because it does not grant him the right to conduct discovery which he claims is necessary to acquire the evidentiary documents needed to support the claims for relief he presented in his petition. We have previously addressed and rejected this argument. In State v. Franklin (May 17, 2002), Montgomery App. No. 19041, 2002-Ohio-2370, we stated:
 {¶ 59} "In his seventeenth claim for relief, Franklin argued that Ohio's postconviction process is inadequate. We have held that the statute is not unconstitutional. See State v. Taylor (June 29, 2001), Greene App. Nos. 2000 CA 77, 2000 CA 103, unreported.
 {¶ 60} "State post-conviction review is not a constitutional right.State v. Kinley (1999), 136 Ohio App.3d 1, 7, 735 N.E.2d 921, 926, dismissed (2000), 88 Ohio St.3d 1444, 725 N.E.2d 284 (citation omitted). Thus, a petitioner for post-conviction relief receives no more rights than those granted by the post-conviction relief statute, R.C. 2953.21. Id., citing State v. Calhoun (1999), 86 Ohio St.3d 279, 281,714 N.E.2d 905, 909. Although R.C. 2953.21 does not grant a petitioner the right to conduct discovery, the statute is not unconstitutional because a defendant has no constitutional right to state post-conviction relief generally." Id., at ¶ 61.
 {¶ 61} See also: State v. Bays (June 20, 2003), Greene App. No. 2003CA4, 2003-Ohio-3234 at ¶ 20. The trial court did not commit error in failing to allow Defendant to conduct discovery with respect to his postconviction petition.
 {¶ 62} The second assignment of error is overruled.
 {¶ 63} THIRD ASSIGNMENT OF ERROR
 {¶ 64} "Considered together, the cumulative errors set forth in appellant's substantive grounds for relief merit reversal or remand for a proper postconviction process."
 {¶ 65} Defendant argues that even if none of his individual grounds for relief in his postconviction petition are sufficient to warrant an evidentiary hearing or other relief, the cumulative effect of those errors is sufficient to "merit reversal or remand for a proper postconviction process." However, because we have found only one error, and not multiple errors, in the trial court's dismissal of Defendant's postconviction claims, there can be no cumulative effect. State v.Blankenship (1995), 102 Ohio App.3d 534, 557.
 {¶ 66} The third assignment of error is overruled. Pursuant to our disposition of the first assignment of error, the judgment of the trial court will be reversed and this matter remanded to the trial court for a hearing consistent with this opinion.
Wolff, J. and Young, J., concur.