NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0152n.06

Nos. 14-4063/23-3847

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 26, 2026
KELLY L. STEPHENS, Clerk

JUAN ANTONIO LAMAR KINLEY,

 Petitioner-Appellant

 v.

MARGARET BRADSHAW, Warden,

 Respondent-Appellee

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

Before: MOORE, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** In these consolidated cases, Petitioner-Appellant Juan Antonio Lamar Kinley, an Ohio death-row prisoner, appeals the denial of his petition for a writ of habeas corpus. We AFFIRM.

**I.**

**A.**

Between August 1988 and January 1989, Kinley dated Thelma Miller. *State v. Kinley*, 651 N.E.2d 419, 420 (Ohio 1995). During that time, Kinley physically abused Miller and threatened to kill her if she dated someone else. Miller began dating someone else, and on January 8, 1989, Miller and her new boyfriend were at her apartment when Kinley showed up, shoved her, and threatened to kill her and her two sons. Miller's older son called 911. The next day, Kinley told a friend that he felt like killing Miller and that no one could have Miller if he could not. That same day, Miller scheduled an appointment with a crisis-intervention agency for battered women.

On the morning of January 10, Miller arrived at the residence of the Szulewski family, where she worked as a housekeeper. At 10 a.m., Mrs. Szulewski, who was at work, spoke with Miller on the telephone. When Mrs. Szulewski called her again at 1 p.m., the call went unanswered. At 5 p.m., Mrs. Szulewski returned home and found Miller and Miller's younger son, David Miller, lying in a pool of blood in the garage. Several of Miller's appendages had been severed from her body. Bloody shoeprints were found in the garage but not in the house.

Kinley was with Victor Bishop on January 10. Bishop testified that Kinley arrived at his house at 9:45 a.m. and left an hour later. An hour after that, Kinley returned to Bishop's house "with a large sum of money in a flowered bank envelope." *Id*. at 421. Bishop noticed that Kinley "had a set of car keys that [Kinley] had not been carrying earlier that day." *Id*.

When the police investigated the crime scene, Miller's "car keys were nowhere to be found," and her "purse was missing from the Szulewskis' home, along with $121 she had been carrying in a flowered bank envelope a day or two before the murders." *Id*. "Approximately $300 in cash was missing from a dresser in the Szulewski bedroom" along with "$25 that Elaine Szulewski had placed under a tissue box for payment of [Miller]'s cleaning services." *Id*. Also, "Richard Szulewski's machete was missing from the garage." *Id*.

Witnesses saw Kinley "near the scene of the killings." *Id*. Kinley initially "denied having ever been to the Szulewski residence." *Id*. He later "admitted that he had been to the Szulewski residence the day of the murders" but "gave differing accounts of his visit to the residence." *Id.* at 421, 426. He consistently maintained that he did not commit the murders. Kinley's jacket contained bloodstains, however, and "DNA analysis revealed that it was highly probable the blood had come from David Miller." *Id*. at 421.

An examination of the vehicle that Kinley drove on the day of the murders discovered human blood on the steering wheel, and in a search of Kinley's home the police "found $291.50 in cash and approximately $30 to $50 worth of marijuana." *Id*. at 422. Sometime later, the police found a "bloodstained machete" "in an alley behind [Kinley]'s house." *Id*. at 422. Mr. Szulewski "identified the machete as belonging to him," and "the coroner testified that the victim's wounds were consistent with having been caused" by the machete. *Id*. The police detective who testified to recovering the machete acknowledged on cross-examination that Kinley's address had been published in the newspaper and Kinley was in custody at the time the machete was found.

According to the state, later in January, Kinley "admitted to his friend, Donald A. Merriman, that he had killed Thelma and David Miller. [Kinley] told Merriman that he . . . had 'fucked them up.'" *Id.* at 422. Merriman's testimony lies at the core of the present appeal.

Kinley was charged with two counts of aggravated murder, each with a capital specification: one charging murder with prior calculation and design and one charging felony murder premised on aggravated robbery. Kinley waived his right to a jury trial. A three-judge panel convicted Kinley of two counts of aggravated felony murder and sentenced him to death. The panel also imposed a sentence of ten to twenty-five years in prison on the aggravated robbery conviction. The Ohio Court of Appeals and the Ohio Supreme Court affirmed the convictions and sentences on direct appeal. *State v. Kinley*, No. 2826, 1993 WL 224496 (Ohio Ct. App. June 24, 1993), *aff'd*, 651 N.E.2d 419 (Ohio 1995).

**B.**

The state trial court summarily denied Kinley's first state postconviction petition but the Ohio Court of Appeals determined that two of his claims warranted an evidentiary hearing and reversed in part. *State v. Kinley*, 735 N.E.2d 921 (Ohio Ct. App. 1999). Specifically, the Court of

Appeals instructed the trial court to conduct an evidentiary hearing on Kinley's claim that the prosecution knowingly offered the false testimony of witnesses Donald Merriman and Victor Bishop, and his claim that he was forced to waive his right to a jury trial in exchange for expert testimony. In his first postconviction motion, Kinley based his false-testimony claim on affidavits signed by Merriman recanting his trial testimony. The Court of Appeals determined that "the trial court should not have discredited Merriman's affidavit without a hearing." *Id.* at 935.

On remand, the trial court conducted the evidentiary hearing and again denied relief. *State v. Kinley*, No. 89-CR-65, 2001 WL 36058500 (Ohio C.P. May 22, 2001). Merriman failed to appear for the hearing, and, on the record before it, the court found that Kinley "failed to prove that Donald Merriman['s] original testimony was false." *Id.* The Ohio Court of Appeals affirmed, *State v. Kinley*, No. 2001-CA-38, 2002 WL 538894 (Ohio Ct. App. Apr. 12, 2002), and the Ohio Supreme Court declined jurisdiction, *State v. Kinley*, 774 N.E.2d 766 (Ohio 2002) (table).

In April 2003, Kinley filed a federal habeas petition asserting twenty-nine grounds for relief. In May 2006, Kinley deposed Merriman and filed a two-part merits brief in federal court. On October 2, 2014, the district court dismissed the petition and certified the following issues for appeal: "Grounds 5 & 6; Ground 15; Grounds 16 & 17; and Ground 18."[1] R. 85, PageID 803. The district court determined that it could not consider the 2006 deposition in light of *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), which confines a federal court's habeas review to the record before the state court. Kinley appealed to this court in the first of these consolidated cases, docketed as Case No. 14-4063. We then granted his motion to hold his federal case in abeyance pending other litigation.

---

[1] The certification of ground 6 appears to be a typographical error. Kinley withdrew ground 6. In its opinion and order, the district court considered grounds 5 and 26 together. The district court also certified them together, mistakenly indicating ground 6 rather than ground 26.

In 2015, Kinley filed his second state postconviction petition based on Merriman's deposition testimony. *State v. Kinley*, No. 2016-CA-11, 2018 WL 3096664 at *2 (Ohio Ct. App. June 22, 2018). The trial court dismissed the petition, and the Ohio Court of Appeals affirmed the dismissal. *Id.* at *2, *9. The Ohio Supreme Court declined jurisdiction. *State v. Kinley*, 116 N.E.3d 154 (Ohio 2019) (table).

In 2019, on Kinley's motion, we remanded this case to permit the district court to consider the deposition testimony relating to grounds 16 and 17. In March 2020, Kinley sought habeas relief on grounds 16 and 17, but the district court denied the motion without prejudice. In February 2022, after Kinley asked for clarification of our 2019 order, we instructed the district court to "reconsider its October 2, 2014 order with respect to petitioner's Sixteenth and Seventeenth grounds for relief in light of new deposition testimony, and provide[d] it with jurisdiction to do so," and to "issue an additional ruling in petitioner's Sixteenth and Seventeenth grounds for relief once it ha[d] reconsidered these claims in light of the new deposition testimony." R. 139, PageID 9248. In response to the clarified order, the district court considered the 2006 deposition testimony but once again denied relief. The district court issued a COA for grounds 16 and 17. Kinley filed a second appeal with this court, docketed as Case No. 23-3847. We then denied Kinley's motion to expand the COA to include ground 12 (asserting that prosecutorial misconduct denied him a fair trial) and ground 20 (asserting that trial counsel was ineffective for failing to retain a blood-spatter expert). Kinley now has six remaining grounds for relief.

## II.

We review the district court's denial of habeas relief de novo. *Taylor v. Jordan*, 10 F.4th 625, 632 (6th Cir. 2021). De novo review extends to the district court's legal conclusions on mixed questions of law and fact, but findings of fact are reviewed for clear error. *Daniel v. Burton*, 919

F.3d 976, 978 (6th Cir. 2019).  If, however, the district court relied solely on the state-court record, its factual findings are reviewed de novo.  *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (per curiam).  The state court's findings of fact are presumed correct unless rebutted by clear and convincing evidence.  *Daniel*, 919 F.3d at 978.

Kinley's claims are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to the extent they were adjudicated on the merits by the state courts.  *See Adams v. Bradshaw*, 826 F.3d 306, 310 (6th Cir. 2016).  AEDPA authorizes habeas relief only if the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A "contrary to" state-court decision "adopts a conflicting legal rule or reaches the opposite result in a case with materially identical facts." *Fields v. Jordan*, 86 F.4th 218, 232 (6th Cir. 2023) (en banc) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)), *cert. denied*, 144 S. Ct. 2635 (2024).  An "unreasonable" state-court decision features "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. (quoting *Harrington v. Richter*, 562 U.S. 83, 103 (2011)).  The unreasonableness showing is "'a substantially higher threshold' for obtaining relief" than showing that "the state court's determination was debatable or incorrect."  *Id*. at 241 (quoting *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (further citation omitted)).

## III.

Kinley's six remaining grounds for relief fall into three categories.  First, he argues that the state knowingly presented Merriman's false testimony that Kinley confessed (ground 16) and that Merriman received nothing in exchange for his testimony (ground 17).  Second, he argues that the

trial court's colloquy was insufficient to guarantee that the waiver of his right to a jury trial was knowing, intelligent, and voluntary (ground 5), that his waiver was not knowing, intelligent, and voluntary (ground 26), and that his waiver was improperly coerced (ground 15). Third, he argues that a conflict existed with his initial appointed counsel (ground 18). We consider each category in turn.

**A.**

At trial, the prosecution presented Merriman's testimony that Kinley confessed to the killings (ground 16). Merriman further testified that he received no consideration related to his own criminal charges in exchange for his testimony (ground 17). The prosecution did not correct him. Kinley argues that Merriman lied and the prosecution knew it, and that, in failing to disclose the deal made for Merriman's testimony, the prosecution violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Kinley further argues that the prosecution's failure to correct Merriman's testimony, which the prosecution knew to be false, violated *Napue v. Illinois*, 360 U.S. 264 (1959).

**1.**

We begin with ground 17, Kinley's claim that the state knowingly elicited and failed to correct Merriman's false testimony that there was no deal.[2]

Kinley alleges violations of *Brady* and *Napue*. In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. We have explained that, to prevail on a

---

[2] Because we reject Kinley's claim on the merits, we need not consider the parties's positions on AEDPA deference and procedural default. *See Hanna v. Ishee*, 694 F.3d 596, 610 (6th Cir. 2012) ("this Court may deny relief on the merits, notwithstanding a failure to exhaust, where appropriate").

*Brady* claim, a defendant must show "(1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice." *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In *Napue v. Illinois*, the Supreme Court established that a conviction knowingly "obtained through use of false evidence" violates the Fourteenth Amendment's Due Process Clause. 360 U.S. at 269. "To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (quoting *Napue*, 360 U.S. at 269). If a defendant makes that showing, the defendant is entitled to a new trial if there is "any reasonable likelihood" that the false testimony could "have affected the judgment of the jury." *Id.* (quoting *Giglio*, 405 U.S. at 154).

We analyze ground 17 under *Napue* because, if the prosecution intentionally presented false evidence that no deal existed for Merriman's testimony, that would necessarily constitute a *Brady* violation as well. *See Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (even an "unwritten or tacit agreement is . . . subject to *Brady*'s disclosure mandate"). The materiality standards for each claim are the same. *See Giglio*, 405 U.S. at 154. Accordingly, if Kinley makes out a *Napue* claim, he will have demonstrated a *Brady* violation as well.

a.

Kinley must first demonstrate that Merriman testified falsely at trial and that the prosecution knew that the testimony was false. As relevant to ground 17, Merriman testified at trial that he did not attempt to make a deal with the prosecutor's office in exchange for offering information related to, and ultimately testifying in, Kinley's case. At the time, Merriman had five pending forgery charges and had pled guilty to a grand-theft charge but had not yet been sentenced.

At trial, in describing his choice to testify against Kinley, Merriman denied that there was any deal concerning his testimony, stating "I know the prosecutor's office doesn't make deals." R. 104-1, PageID 7334. Notably, this testimony took place immediately after the prosecutor asked Merriman about his forgery charges. But the prosecutor's question—"Did you attempt to make some kind of deal with the prosecutor's office in exchange for this information?"—asked him to disclose *any* deal he made or attempted to make in exchange for testimony, either in relation to his forgery charges or grand-theft charge. *Id*.

On cross-examination, Merriman stated that he reached a plea agreement with the prosecutors in his forgery case in which the state dropped two of the forgery charges, and he "plead [sic] to three of them." R. 104-1, PageID 7335. He further explained, "[m]y public defender made a deal for me." *Id*. When asked, he clarified that the deal was made after he contacted the jail offering his testimony in Kinley's case. Merriman thus acknowledged that he made a plea deal in his forgery case, but he denied that the deal had anything to do with his testimony in Kinley's case.

On redirect examination, Merriman reiterated his denial when the prosecutor asked: "Mr. Merriman, you've indicated that you were not motivated . . . to tell this information to the sheriffs by the desire to obtain some kind of a deal on your behalf. What was your motivation, why did you tell the officers what the Defendant had told you?" *Id*. at 7346. Merriman responded that he thought "it was wrong the way those two people was killed." *Id*. As this exchange makes clear, Merriman testified at trial that no deal of any kind took place, not simply that no deal existed in relation to his forgery charges.

Kinley contends that this trial testimony was false. Kinley points to Merriman's 2006 deposition in which Merriman testified that his trial testimony was false. Merriman stated, "[a]ll

-9-

I was thinking about was getting out of going to prison," and so he agreed to a deal in his forgery case that involved his testimony in exchange for getting "[s]ix months and jail and some of the cases that were against [him] dismissed." R. 44-1, PageID 206. Regarding his grand-theft charge, Merriman initially stated, "I was hoping that case would be taken care of as a result of me testifying" but that he could not remember a specific deal. *Id.* at 208. Counsel then showed him the sentencing transcript for his grand-theft case and asked, "you in fact did get a deal [in the grand-theft case] for testifying?" *Id.* at 221. Merriman agreed that he did. *Id.* His 2006 deposition testimony thus indicates that he received a deal in both cases in exchange for his testimony at Kinley's trial and that his trial testimony to the contrary was false.

The district court found this deposition testimony unpersuasive given Merriman's lack of credibility—just as the Ohio courts rejected a *Napue* claim premised on Merriman's affidavits. Similarly, the warden argues that ground 17 fails because Kinley has not demonstrated that Merriman's trial testimony was false as to the existence of a deal.

However, the transcript of Merriman's sentencing for his grand-theft conviction, which was introduced as an exhibit to Merriman's deposition, provides evidence in support of Kinley's claim that does not depend on Merriman's credibility. On May 15, 1991, during Merriman's grand-theft sentencing, the prosecutor, Darnell Carter, confirmed that the state recommended probation, explaining that Merriman "testified in State versus Juan Kinley [in March 1991] and at that time I conferred with Mr. Merrell [Merriman's public defender] . . . that the State in exchange for [Merriman's] entering of a guilty plea and for consideration of his testimony in the Merriman [sic] case, we would recommend probation in this matter." R. 44-5, PageID 174. Carter mentioned that Merriman had failed to appear for a prior sentencing, but stated that he felt "compelled to restate the recommendation because I think that I am bound to do so. He did enter the plea, and

he did testify in the Kinley case." *Id.*, PageID 175. Carter clearly stated that Merriman was receiving "consideration" in the form of a reduced sentence "in exchange" for his plea and his testimony in the Kinley case. R. 44-5, PageID 174. Indeed, he stated that he felt "bound" by that deal, despite concerns about Merriman. *Id.*, PageID 175. He also stated that he was bound after his consultation with Merriman's attorney—indicating that the arrangement he discussed was agreed to in advance, not that he was providing consideration after Merriman's testimony. The chronology of Merriman's grand-theft case supports the conclusion that, at the time of his testimony in Kinley's trial, he had a deal with the prosecution related to his testimony. Merriman pled guilty to theft charges before he testified against Kinley. But his sentencing occurred after Kinley's trial. The deal that "bound" Carter thus must have been agreed to before Kinley's trial. *Id.*

Finally, the prosecution clearly knew that Merriman's testimony denying the existence of a deal was false—the prosecutor's office was a party to the deal. *Giglio*, 405 U.S. at 154 ("A promise made by one attorney must be attributed, for these purposes, to the Government."); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"). Based on Merriman's 2006 deposition testimony and the appended transcript, we conclude that Merriman's trial testimony was false and that the prosecution knew it.

The district court disagreed with this analysis, concluding that, "[n]othing about the pleas and sentences raises red flags that Merriman was *promised* leniency in exchange for testifying against Petitioner." R. 146, PageID 9322 (emphasis in original). The district court noted that the forgery case was disposed of before Merriman testified in Kinley's case, and that he pled guilty to the grand-theft charge before Kinley's trial. The district court cited Carter's testimony at Kinley's

postconviction hearing that there was no deal. At the postconviction hearing, Carter testified, "I don't even know that I knew that he was going to testify in the Kinley case at the time." R. 104-2, 8740. The district court did not analyze Carter's statements at Merriman's sentencing and instead focused on Merriman's unreliability. Weighing the multiple recantations of Merriman on one side, and the testimony of the prosecutors on the other, the district court concluded that Kinley had not presented sufficient evidence to undermine the state court's conclusion that Merriman's trial testimony was truthful.

The district court's analysis echoed the conclusion of the state courts, which considered Merriman's affidavits rather than his deposition and the sentencing transcript. The state court analyzed Merriman's affidavits and the testimony of Carter and other prosecutors and concluded that, "while there is evidence that Merriman was given a lighter sentence after the fact because of his testimony, there is no evidence of a promise of leniency to Merriman prior to his testimony." *Kinley*, 2002-Ohio-1791, 2002 WL 538894 *6. The state court did not reference or quote from Merriman's sentencing transcripts in concluding that Merriman's deposition, which included the sentencing transcript, was cumulative. Similarly, the warden does not acknowledge the comments made by Carter at sentencing. Rather, the warden argues in general terms that Kinley "failed to substantiate his claims that Merriman testified falsely" based on Merriman's evident lack of reliability. Appellee's Br. at 18.

Importantly, Kinley need not show the existence of an explicit promise. Even an "unwritten or tacit agreement is . . . subject to *Brady*'s disclosure mandate." *Bell*, 512 F.3d at 233. The language used by Carter at Merriman's sentencing clearly speaks to such an agreement. And given that Merriman pled guilty before his testimony at Kinley's trial, that deal likely occurred at the time of his plea. Carter stated that he "conferred" with Merriman's lawyer and "in exchange"

for the plea deal and the testimony, he recommended probation. R. 44-5, PageID 174. Later, he stated that he considered himself "bound" to recommend probation, despite other concerns about Merriman, because of Merriman's plea. *Id.*, PageID 175. Carter's statements clearly speak to a prearranged deal, or at least a tacit agreement, not leniency extended after the fact. Thus, the sentencing transcript confirms the veracity of Merriman's 2006 deposition testimony.

b.

Kinley must next show that the prosecution failed to correct Merriman's false testimony. The warden makes no effort to argue that the state corrected Merriman's false testimony.

c.

Assuming that the foregoing establishes a *Napue* violation, we address whether "the false testimony could . . . in any reasonable likelihood have affected the judgment of the [three-judge panel]." *United States v. Fields*, 763 F.3d 443, 462 (6th Cir. 2014) (quoting *Giglio,* 405 U.S. at 154. In *Napue*, the Supreme Court held that evidence can be material if it goes "to the credibility of the witness." 360 U.S. at 269. Notably, materiality "is not a sufficiency of evidence test." *Kyles v. Whitley*, 514 U.S. 419, 419 (1995). To the contrary, the "materiality standard requires 'the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Glossip*, 604 U.S. at 246 (quoting *United States v. Bagley*, 473 U.S. 667, 680, n. 9 (1985)). Because any *Napue* violation here was not material, Kinley's claim fails at this juncture.

In its most recent application of *Napue*, the Supreme Court held that the prosecution's failure to correct false testimony undermining a witness's credibility can be material even if there is other evidence of the witness's unreliability. *Glossip*, 604 U.S. at 250 (2025). In *Glossip*, the state presented the testimony of Justin Sneed, who claimed that the defendant, Richard Glossip,

paid him to murder his boss. *Id.* at 231. During his testimony, Sneed claimed that he had never seen a psychiatrist and did not know why he had been prescribed lithium. *Id.* at 246-47. But the medical record kept by the sheriff's department revealed that this testimony was false; Sneed had been diagnosed with bipolar disorder and prescribed lithium. *Id.* The Court pointed out that, "had the prosecution corrected Sneed on the stand, his credibility plainly would have suffered." *Id.* at 248.

The Supreme Court determined that the prosecution's failure to correct Sneed's false testimony was material "[b]ecause Sneed's testimony was the only direct evidence of Glossip's guilt of capital murder [and therefore] the jury's assessment of Sneed's credibility was necessarily determinative." *Id.* The Court made this finding despite the conclusion of the Oklahoma courts that "circumstantial evidence . . . sufficiently corroborated Sneed's testimony" inculpating Glossip. *Id.* at 236. Further, it acknowledged that ample other evidence suggested Sneed was unreliable. *Id.* at 248. It also acknowledged that Sneed's false testimony did not concern disputed issues. *Id.* at 249 ("Even if Sneed's bipolar disorder were wholly irrelevant, as amicus argues, his willingness to lie about it to the jury was not."). And, as the dissent pointed out, "[i]t would not have been challenging for the parties to deduce the reason for Sneed's lithium prescription [because] lithium's sole medical purpose, both in 1997 and today, is to treat bipolar disorder and other mental health disorders." *Id.* at 268 (Thomas, J., dissenting). The majority nonetheless held that the additional evidence of Sneed's unreliability materially prejudiced Glossip's defense.

Kinley cannot show that the state's failure to correct Merriman's false testimony at trial caused him material prejudice. First, unlike in *Glossip*, there was overwhelming evidence connecting Kinley to the murders. *See Cooper v. Chapman*, 970 F.3d 720, 732 (6th Cir. 2020) ("circumstantial evidence is entitled to equal weight as direct evidence" (citing *Desert Palace, Inc.*

*v. Costa*, 539 U.S. 90, 100 (2003)). The state presented evidence that Kinley physically abused Miller and threatened to kill her if she dated anyone else. It also presented evidence from multiple witnesses that Kinley was at the scene of the crime. Further, the steering wheel of Kinley's car had human blood on it, his jacket had human blood on it that was a DNA match to one of the victims, his home had cash in a similar amount to the cash stolen from scene of the crime, and Mr. Szulewski's bloody machete was found in an alley behind Kinley's house. Given the overwhelming evidence of Kinley's guilt, we are persuaded that there is no reasonable likelihood that the outcome would have been different if the prosecution had corrected Merriman's false testimony about his deal.

In so concluding, we are mindful that "[a] defendant's confession is 'probably the most probative and damaging evidence that can be admitted against him,'" and that the impact of confession testimony is so great that "we may justifiably doubt [a jury's] ability to put [it] out of mind even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 292, 296 (1991) (citation omitted). But here, Kinley's confession was relayed to a panel of three judges by Merriman, a witness with evident credibility issues. Merriman admitted to passing bad checks and other criminal activity, and even conceded that he had arranged a deal right around the time he chose to testify against Kinley. We are confident that the further revelation that his deal involved testifying against Kinley would not have changed the panel's evaluation of his credibility nor the outcome of this case.

Given the overwhelming evidence of Kinley's guilt, we are persuaded that the outcome would not have been different had Merriman's testimony been corrected. Accordingly, Kinley is not entitled to relief under ground 17.

**2.**

In ground 16, Kinley separately seeks relief on the basis that the state presented false testimony that he confessed to Merriman. Kinley again relies on the deposition of Merriman, which recants his trial testimony. But the deposition states only that Merriman testified falsely that Kinley confessed to him, not that the prosecution knew this testimony was false or otherwise withheld exculpatory information. Kinley has not presented other evidence that the state knew that Merriman's testimony regarding the confession was false. It is not enough to assert that a trial witness testified falsely. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993). "[A]bsent an independent constitutional violation occurring in the underlying state criminal prosecution," Kinley is not entitled to relief on ground 16. *Id.* at 391.

**B.**

Kinley next contends that the trial court did not ensure that he knowingly, voluntarily, and intelligently waived his right to a jury trial. Specifically, Kinley argues in grounds 5 and 26 that he should have been told that his waiver of a jury would impact the sentencing phase, where a three-judge panel rather than a panel of jurors would determine the death-penalty specifications. In ground 15 Kinley argues that the prosecutor and trial judge improperly coerced his jury trial waiver by requiring it in exchange for funding for a mental-health expert. These claims were both raised in the Ohio courts and rejected on the merits. On direct appeal, the Ohio Court of Appeals rejected Kinley's claim that he did not knowingly and intelligently waive his right to a trial by jury. *Kinley*, No. 2826, 1993 WL 224496, at *15. On postconviction review, the trial court and Ohio Court of Appeals both rejected Kinley's claim that the prosecutor and judge forced him to trade his right to a jury trial for expert-witness funding. *Kinley*, 2002-Ohio-1791, 2002 WL 538894

at *4. We therefore apply the deferential standards of review in § 2254(d) to the legal and factual determinations of the Ohio Court of Appeals.

Under Supreme Court precedent, "a waiver of [a] right to trial before a jury" . . . "not only must be voluntary but must be [a] knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). This means that the defendant must have "understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." *Otte v. Houk*, 654 F.3d 594, 601 (6th Cir. 2011) (quoting *Jells v. Mitchell,* 538 F.3d 478, 510 (6th Cir.2008)). "A petitioner bears the burden of proving that his waiver was not, in fact, voluntary, knowing, and intelligent." *Otte*, 654 F.3d at 601. That said, "we will not presume waiver from a silent record." *Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004). In past cases, we have "implore[d] the district courts to personally inform each defendant of the benefits and burdens of jury trials on the record prior to accepting a proffered waiver." *United States v. Martin*, 704 F.2d 267, 274 (6th Cir. 1983). But "[t]here is no constitutional requirement that a court conduct an on the record colloquy with the defendant prior to the jury trial waiver." *Id.*

**1.**

In grounds 5 and 26, Kinley argues that he did not knowingly and intelligently waive his right to trial by jury. But the record reflects that the trial court conducted a colloquy on the record, telling Kinley that he had a constitutional right to be tried by a twelve-person jury of his peers. The trial court also told Kinley that the jury "has to unanimously agree that the State proved its case beyond a reasonable doubt as to each and every element of the charges . . . in the indictment

. . . includ[ing] the specifications." R. 104-1, PageID 6367. In response, Kinley said that he understood his right to a jury trial and wanted to waive it. *Id.*

Of particular relevance here, the trial court added that the right to a jury trial "extends to the additional question, if the jury returns a verdict of guilty on this offense of murder, there is a separate hearing where the jury would be asked to make a recommendation in regard to the penalty." *Id.*, PageID 6368. The trial court explained the available sentencing ranges and then told Kinley that if the jury "make[s] a recommendation, for something less than a death penalty, that recommendation would be binding on the Judge." *Id.* Kinley again confirmed his understanding and his continued desire to waive the right to a jury trial. Finally, Kinley confirmed that he discussed the waiver with trial counsel, understood it, and wanted to enter it.

After his oral waiver, the trial court referred Kinley to a written waiver that trial counsel had prepared. Kinley told the court that he read, understood, and wished to voluntarily sign the waiver, which he and trial counsel then did. As part of this inquiry, the trial court asked Kinley about his education, and Kinley informed the court that he had obtained his GED, attended college, and obtained a certificate in two programs. The waiver stated that Kinley "with his counsel and in open Court and in writing in the Court's presence, knowingly, intentionally and voluntarily waives his right to a trial by jury and requests a trial before a three (3) judge panel." R. 102-2, PageID 1255.

Kinley argues that his waiver was not valid because he was not told that "the concurrence of only three judges," and not "twelve ordinary citizens he would have a role in choosing," would need to "convict him of the underlying charges" and "the death penalty specifications"; "the opportunity for reversal of a conviction and/or death sentence on appeal is greatly diminished when a jury is waived"; and "the jury waiver may be withdrawn at any time before the commencement

-18-

of trial." Appellant's Br. at 72-73. In particular, Kinley focuses on the fact that "he was never told, and therefore did not know, that the jury had to be unanimous to recommend death and that one juror could spare his life." *Id.* at 79. He also argues that he should have been told that, "even if the jury unanimously recommends the death penalty, the trial court also must independently find beyond a reasonable doubt that death is the correct sentence before the defendant may be sentenced to death; so, he gives up a two-stage process when waiving [a] jury for sentencing." Appellant's Br. at 74.

Our precedent squarely forecloses Kinley's arguments. We have made clear that the defendant must understand "the type of proceeding he was choosing—jury or judge—not the procedural specifics of either." *Davis v. Jenkins*, 115 F.4th 545, 563 (6th Cir. 2024) (en banc) (citing *Sowell*, 372 F.3d at 836), *cert. denied*, 145 S. Ct. 2756 (2025). In another capital case, we upheld a defendant's waiver of the right to trial by jury where the defendant was not told that "the jury would decide whether or not to recommend a death sentence and that such a decision by the jury must be unanimous." *Sowell*, 372 F.3d at 834. We have also rejected the specific argument that a defendant must be told that "waiving his right to a jury would reduce the sentencing phase of his trial from a two-step process whereby a judge and jury must determine that death is appropriate to a one-step process where the panel could impose the sentence of death." *Haliym v. Mitchell*, 492 F.3d 680, 699 (6th Cir. 2007) (collecting cases).

The colloquy and written waiver here meet the constitutional minimum because they sufficiently informed Kinley that he was waiving his right to be tried by a panel of jurors. Our precedents do not require that the trial judge provide more specific information on the procedures and potential benefits of a trial by jury, even in a capital case. Therefore, the Ohio Court of

Appeals' rejection of Kinley's claim does not contradict or unreasonably apply the Supreme Court's clearly established law.

Kinley relies on our decision in *United States v. Martin*, 704 F.2d 267, 274 (6th Cir. 1983). In that case, we stated that a defendant "is sufficiently informed" to make a valid waiver if the trial court tells him that "a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right." *Id.* at 273. But "[t]he statement that this knowledge is *sufficient* is not, of course, equivalent to a statement that it is constitutionally required." *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir. 1990). In fact, we have since "expressly stated that the elements of a knowing jury waiver outlined [in *Martin*] are not constitutionally required." *Sowell*, 372 F.3d at 832 (citing *Sammons*, 918 F.2d at 597).

We acknowledge that the colloquy here could have, and likely should have, been made clearer by explicitly informing Kinley that a jury would also need to unanimously recommend death. But Kinley's burden is to demonstrate that the Ohio courts departed from clearly established law and our precedent requires only that "the defendant must understand that the choice he faces is to be judged by a jury composed of people from the community as opposed to having his guilt or innocence determined by a judge." *Fitzpatrick v. Robinson*, 723 F.3d 624, 639 (6th Cir. 2013). The colloquy here did not fall below the constitutional threshold. Kinley is therefore not entitled to relief on grounds 5 or 26.

**2.**

In ground 15, Kinley argues that his jury trial waiver was involuntary because it was coerced. He asserts that the prosecutor and the trial court coerced his trial counsel into making a secret deal to have Kinley waive his right to a jury trial in exchange for funds to retain a mental-

health expert. Kinley presented this claim to the Ohio courts during his first state postconviction proceeding. The trial court summarily denied relief, but the Ohio Court of Appeals reversed and ordered the trial court to hold an evidentiary hearing. *Kinley*, 735 N.E.2d at 936. On remand, the trial court conducted the evidentiary hearing and again denied relief. The second time, the Ohio Court of Appeals affirmed because "the trial court's decision that there was no trade was supported by competent, credible evidence." *Kinley*, 2002 WL 538894, at *4.

Kinley focuses on the trial court's initial denial of counsel's requests for funds for expert assistance. On November 5, 1990, trial counsel moved for funds to retain a psychologist and a mitigation expert to help determine whether Kinley "lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" due to "a mental disease or defect." R. 102-1, PageID 1114 (citing Ohio Rev. Code § 2929.04(B)(3)). The prosecutor opposed the request, asserting that, under state law, a criminal defendant was "not constitutionally or statutorily entitled to an independent psychological expert," and suggested that, alternatively, relief was available under Ohio Revised Code § 2929.03(D)(1), which "provides for the mental examination if a mitigation hearing is requested." *Id.*, PageID 1157-58.

On December 18, 1990, trial counsel moved for the appointment of Stacey Michael, a mitigation specialist, and James Eisenberg, Ph.D., a forensic psychologist. *Id.*, PageID 1160. The prosecutor opposed the motion because Kinley did not assert insanity or diminished capacity as mitigating factors and did not show "a 'particularized need' for the requested experts." *Id.*, PageID 1168. The trial court denied the motion, acknowledging that Kinley wanted "to gather evidence of mitigating factors to be presented under R.C. 2929.04(B)(7) at the sentencing hearing," but determining that the "expert testimony sought does not relate to any factual dispute or particularized need in this case. Neither insanity [n]or diminished capacity is an issue in this case."

R. 102-1, PageID 1181.  Following Kinley's rehearing motion, however, the parties agreed that Kinley should receive funds for a mitigation specialist.  *Id*., PageID 1198, 1200-01.

On February 13, 1991, Kinley moved for reconsideration of the decision denying the appointment of a psychologist "based on newly discovered matter."  R. 102-2, PageID 1250.  On February 19, 1991, Kinley waived his right to a jury trial.  *Id*., PageID 1255.  On February 20, 1991, the trial court authorized funding to retain Dr. Eisenberg and ordered that "a copy of Dr. Eisenberg's report be furnished to the Prosecutor prior to trial and all evidence relevant to the mental condition of the Defendant at the time of the offense be furnished to Dr. Eisenberg."  *Id*., PageID 1258-59.

Kinley argues that the trial court changed its mind and granted the requested expert funding only because his counsel made a deal in which Kinley waived his right to a trial by jury.  He relies on the affidavits and testimony of his trial counsel, James Doughty and John Butz.  Both attorneys submitted affidavits in state postconviction proceedings stating that they made a deal with the prosecution in which Kinley would waive his right to a jury trial and the prosecution would stop opposing the expert-witness funding.  Doughty asserted that the defense was "only able to obtain the funding to hire Dr. Eisenberg by making a deal with Assistant Prosecutor David Smith."[3]  R. 102-9, PageID 3303.  Doughty stated that "at an off-the-record conferment in Judge Lorig's chambers," co-counsel Butz "suggested to Assistant Prosecutor Dave Smith that we would waive the jury if he would stop opposing funding for Dr. Eisenberg," and Smith agreed as did the trial judge, who "was present for the conversation."  *Id*.  Doughty explained that the defense "suggested

---

[3] The state court sustained the state's objection to the admission of this affidavit.  However, the Ohio Court of Appeals seems to have considered Doughty's affidavit in its opinion affirming the denial of postconviction relief.  *See Kinley*, 2002 WL 538894, at *2 ("Kinley also introduced an affidavit from former defense counsel James Doughty, which stated essentially the same things as Butz's testimony.").

this bargain because we thought it the only way we could get funding for a psychologist." *Id*. Doughty stated that he did not tell Kinley about the deal, adding that "I do not know if we would have waived the jury had it not been for the above bargain. We might have waived it anyway, but it is difficult to say." *Id*. Butz also asserted in his affidavit that "waiving a jury was the event which caused Judge Lorig to approve funding for the employment of a psychologist." *Id*., PageID 3305. Finally, Kinley stated in an affidavit that he did not know about the circumstances of his jury waiver and would not have done so had he known. *Id*., PageID 3306-07.

In *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985), the Supreme Court held that, when a defendant's sanity is likely to be a significant factor at trial, "the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." The Supreme Court has further held that *Ake* itself clearly established a right to a mental-health expert "independent from the prosecution to effectively 'assist in evaluation, preparation, and presentation of the defense.'" *McWilliams v. Dunn*, 582 U.S. 183, 186 (2017) (quoting *Ake*, 470 U.S. at 83). Given *McWilliams*'s interpretation of *Ake*, at the time of trial, Kinley had a clearly established right to the expert assistance of a psychiatrist. If the trial court in fact forced Kinley to choose between two constitutional rights, his waiver would have been unconstitutionally coerced.

On § 2254 habeas review, Kinley must show that the Ohio Court of Appeals decision to the contrary was based on an unreasonable determination of the facts. Kinley presented the same evidence and arguments to the state courts. In response, the state presented the testimony of Judge Lorig and two of the prosecutors on the case. Judge Lorig "denied that the jury waiver had been the reason he granted the request for funding of the psychologist." *Kinley*, 2002-Ohio-1791, 2002 WL 538894 at *2. He testified that he initially was not clear on the purpose of the funding request but "had become convinced of its necessity." *Id.* The prosecutors also denied that a deal occurred,

-23-

both stating they "had withdrawn their opposition to the funding request because they had wanted to eliminate a potential appellate issue and because Butz had agreed to give them a copy of the psychologist's report." *Id.* Finally, another prosecutor testified that he had discussed the waiver with defense counsel, who told him that independent factors weighed in favor of Kinley's waiver of trial by jury, in particular, "(1) the gruesome nature of the case, (2) the fact that Kinley was black and the Millers were white, and (3) the age of David Miller." *Id.* at *3. The trial court denied relief and the Ohio Court of Appeals concluded that "the trial court's decision in favor of the state was not against the manifest weight of the evidence." *Id.* at *4.

Kinley cannot overcome the deference owed to the Ohio Court of Appeals under the AEDPA. The state trial court held an evidentiary hearing at which both sides introduced evidence. The trial court believed the state's evidence, and the Ohio Court of Appeals affirmed. Given the conflicting testimony, we cannot say those determinations were unreasonable. In his briefing, Kinley focuses on the timing of his jury waiver and the order granting funding. The Ohio Court of Appeals recognized "that the timing of Judge Lorig's approval of funding was suspicious" but concluded "that alone is not sufficient for us to conclude that the state's evidence was not credible." *Id.* The Ohio Court of Appeals thus clearly understood and considered Kinley's argument that the timing indicated that there was a quid pro quo. Its conclusion that the timing does not conclusively resolve the issue in Kinley's favor is not unreasonable.

Kinley also argues that, even if no deal occurred, his counsel subjectively "believed they were coerced," thus rendering his waiver involuntary. Appellant's Br. at 93. But the Ohio Court of Appeals credited the testimony of Judge Lorig and the prosecutors, who denied that the conversations recounted by defense counsel occurred. Given that factual finding, it is unclear how defense counsel could have reasonably arrived at the conclusion that they were being coerced. In

short, Kinley has not presented evidence establishing that the Ohio courts came to an unreasonable conclusion in light of the factual record. Kinley is therefore not entitled to relief on ground 15.

**C.**

Finally, in ground 18 Kinley argues that his appointed counsel had a conflict of interest, violating his right to due process and his right to counsel. Kinley argues that the Clark County Public Defender's Office simultaneously represented both him and Merriman between March of 1989 and October of 1990 and again during its limited representation of Kinley at trial to cross-examine the prosecution's DNA witnesses. This claim was presented to the Ohio courts during Kinley's first round of state postconviction review and rejected on the merits. *See Kinley*, 735 N.E.2d at 935. We therefore apply the deferential standards of review in § 2254(d) to the legal and factual determinations of the Ohio Court of Appeals.

The Sixth Amendment and the Fourteenth Amendment together require that states appoint counsel for indigent criminal defendants and that counsel be effective. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). As relevant here, that guarantee "secures [criminal defendants] the assistance of counsel free from conflicts of interest." *Leonard v. Warden*, 846 F.3d 832, 844 (6th Cir. 2017). An actual conflict, for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." *Id.* (quoting *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)).

The representation of multiple criminal defendants in the same proceeding does not necessarily result in a conflict of interest. In general, "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." *Cuyler*, 446 U.S. at 346. Because of that, the Supreme Court has recognized that "trial courts necessarily rely in large measure upon the good faith and good

judgment of defense counsel." *Id.* at 347 (citing *Holloway v. Arkansas*, 435 U.S. 475, 485–86 (1978)). The Supreme Court has thus held that a trial court's failure to appoint separate counsel in a joint trial over a defendant's timely objection violated the Sixth Amendment. *Holloway*, 435 U.S. at 485. But if a defendant does not object to a perceived conflict-of-interest, he must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348.

Kinley points to two potential conflicts. The first potential conflict occurred at the beginning of the case. At Kinley's March 16, 1989, arraignment, the court appointed Noel Edward Kaech, an assistant public defender with the Clark County Public Defender's Office, as lead counsel. On May 23, 1989, the trial court appointed John R. Butz, a private attorney, as co-counsel. And on October 12, 1990, the trial court appointed James Doughty, a private attorney, to the defense team. On October 25, 1990, the trial court permitted Kaech to withdraw. Kaech's office, the Clark County Public Defender, had represented Merriman—then a potential witness against Kinley—in a prior case. Kinley acknowledges that the Clark County Public Defender's Office withdrew from its representation of Merriman on March 10, 1989, prior to Kinley's arraignment. But he argues that the office remained in contact with Merriman and arranged for Merriman's plea deal. Kinley also points out that the Clark County Public Defender's Office represented Merriman in subsequent cases. Kinley argues that the simultaneous representation of him and Merriman violated his right to conflict-free counsel.

Second, Kinley points out that Kaech returned to the case during trial to cross-examine the state's DNA experts. Kinley's counsel requested the court allow Kaech to appear for the limited purpose of cross examining the witness and informed the court that Kinley understood the request and agreed with it. On March 8, 1991, the trial court informed Kinley that "Mr. Kaech has

indicated that his office, the public defender for Clark County, Ohio, his office has represented Donald Merriman who was a witness in this case." R. 104-1, PageID 7522. Kinley confirmed his understanding, indicated that he did not object to Kaech's limited representation and waived any possible conflict of interest. Kinley argues that the "waiver was wholly invalid and unacceptable" because he "was not made aware of the ramifications of having the same Office represent him that also represented Merriman." Appellant's Br. at 82.

In analyzing this claim, the Ohio Court of Appeals expressed skepticism that any dual representation had occurred because "[t]he Public Defender's Office withdrew from its representation of Merriman shortly before the indictment against Kinley was filed, apparently in anticipation of that indictment." *Kinley*, 735 N.E.2d at 935. But the court ultimately held that any dual representation "certainly did not prejudice Kinley." *Id.* As for the limited participation of the Public Defender's Office at trial, the court concluded that Kinley waived any conflict. *Id.*

Kinley fails to show that the Ohio courts misapplied clearly established federal law. Although Kinley and Merriman were not codefendants, given Merriman's testimony against Kinley at trial, their interests were in conflict. Kaech's initial representation of Kinley cannot properly be called multiple representation, however, because his office was not then representing Merriman. As for Kaech's representation of Kinley at trial, it was for a limited purpose and at the request of appointed private counsel with Kinley's awareness and waiver of any conflict. Most importantly, in neither instance does Kinley make any attempt to argue that a conflict "adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348. Where a defendant "fails to object to a conflict, only 'a showing of (1) an actual conflict; and (2) an adverse effect on his counsel's performance will void the conviction.'" *White v. Phillips*, 66 F.4th 615, 620 (6th Cir. 2023)

(quoting *Moss v. United States*, 323 F.3d 445, 455 (6th Cir. 2003)). Kinley never objected to the purported conflict, and neither did any of his lawyers.

Kinley seeks to establish prejudice by arguing that Merriman's testimony "was used by the State against Mr. Kinley to achieve the result of the imposition of the death penalty, and this testimony helped Merriman in his own criminal cases." Petitioner's Br. at 84-85. The fact that Merriman testified against Kinley may demonstrate the presence of a conflict of interest, but it does not establish that the performance of Kinley's counsel suffered as a result. Because he has not made any showing of prejudice, Kinley is not entitled to relief.

Finally, Kinley argues that any waiver of a conflict of interest must be knowing and intelligent, and that Kinley could not have properly waived any conflict because "there was no conflict-free counsel who advised Mr. Kinley of this issue." Appellant's Br. at 84. We disagree for two reasons. First, the Supreme Court opinion cited for the proposition that waiver must be knowing and intelligent, *Glasser v. United States*, 315 U.S. 60 (1942), contains no such requirement. Rather, the Supreme Court has placed the burden on defense counsel to alert the court to any potential conflict. *Cuyler*, 446 U.S. at 346; *see also Phillips*, 66 F.4th at 620 ("Where the defendant or his counsel fails to object to a conflict, only 'a showing of (1) an actual conflict; and (2) an adverse effect on his counsel's performance will void the conviction.'" (quoting *Moss*, 323 F.3d at 455). Second, even if such a requirement existed, Kinley's waiver would still be valid because he had independent private counsel advising him, the trial court informed him of the potential conflict, and he affirmatively waived any objection to Kaech's limited trial representation. And, in any event, because Kinley has made no showing of prejudice, he is not entitled to relief on ground 18.

**IV.**

For the reasons stated, we AFFIRM.